**TUXEDO MONOPOLY, INC., Appellant,**

v.

**GENERAL MILLS FUN GROUP, INC., Appellee.**

**Appeal No. 80–559.**

United States Court of Customs and Patent Appeals.

May 7, 1981.

Virginia R. Richard, New York City, attorney for appellant.

Oliver P. Howes, Jr., New York City, and Andrew Baum, Washington, D. C., attorneys for appellee.

Before MARKEY, Chief Judge, RICH, BALDWIN, MILLER, and NIES, Judges.

NIES, Judge.

This appeal is from the decision of the Patent and Trademark Office (PTO) Trademark Trial and Appeal Board (board), reported at 204 USPQ 396 (TTAB 1979), sustaining an opposition to registration of the trademark MONOPOLY for men's, women's, and children's wearing apparel—namely, dresses, skirts, coats, scarves, pant suits, blouses, sweaters, jackets, shirts, slacks, shoes, belts, pantie hose, and socks,[1] on the basis of prior use and registration of the trademark MONOPOLY for a real estate board game.[2] The facts are set out in detail in the opinion of the board at 204 USPQ 397–402 and familiarity with these facts is presumed. We affirm.

## OPINION

In finding likelihood of confusion, the board states:

> [W]e are of the opinion that purchasers who encounter items of clothing bearing the mark "Monopoly", . . . are likely to believe that, or at least wonder whether, the items originate from, or are approved by, or are in some way associated with opposer. [204 USPQ at 401.]

1. Application Serial No. 431,254, filed July 31, 1972, claiming first use on or about July 26, 1972.

2. Registration No. 326,723, issued July 30, 1935, and Registration No. 338,834, issued September 15, 1936.

3. We do not agree that the majority below relied solely on taking judicial notice of a common trade practice, as argued by appellant. The board stated, "This practice is borne out by the evidence in the instant case." We agree.

Thus, the board appears to have found that there would be likelihood of confusion from concurrent use of the mark MONOPOLY on a board game and on all of the goods encompassed by the registration sought by appellant. We could not agree with that broad finding. Nevertheless, likelihood of confusion must be found if the public, being familiar with appellee's use of MONOPOLY for board games and seeing the mark on *any item* that comes within the description of goods set forth by appellant in its application, is likely to believe that appellee has expanded its use of the mark, directly or under a license, for such item.

We agree with the board that appellee's evidence establishes that appellee has built up an enormous goodwill in the mark MONOPOLY, which has been used since 1935 for a board game and that MONOPOLY may properly be termed a "famous" mark. We also find no error in the board's conclusion that it is a matter of common knowledge that famous marks are frequently used on items such as clothing, glassware, and trash cans and that appellee's licensing of its mark for use on certain novelty items supports this conclusion.[3] Further, appellee's vice president testified that requests have been received by appellee for licenses to utilize its mark MONOPOLY on T-shirts (as well as other novelty clothing), and that it has acted against unauthorized use on such goods.

 We conclude that use of the mark MONOPOLY on novelty T-shirts would be likely to cause confusion with appellee and that appellant's broad description of goods includes such items. Appellant's argument

In any event, "collateral product" use is a matter of textbook discussion (*see* J. Gilson, Trademark Protection and Practice § 5.05[10] (1980)) and frequent commentary (*see* Grimes & Battersby, *The Protection of Merchandising Properties*, 69 T.M.Rep. 431 (1979) and references cited therein). Appellant has not requested an opportunity to show that the board's statement that "such use has become a part of life which we cannot ignore" lacks a "high degree of indisputability." Fed.R.Evid. 201, Notes of Advisory Committee.

that it does not intend to make this type of use of the mark MONOPOLY is irrelevant. The question of the likelihood of confusion must be based upon a consideration of appellant's goods as described in the application. *Feed Service Corp. v. FS Services, Inc.,* 58 CCPA 708, 432 F.2d 478, 167 USPQ 407 (1970); *Ford Motor Co. v. Ford,* 59 CCPA 1124, 462 F.2d 1405, 174 USPQ 456 (1972). Further, the description must be construed most favorably to the opposing prior user. *CTS Corp. v. Cronstoms Mfg. Inc.,* 515 F.2d 780, 185 USPQ 773 (CCPA 1975).

Design features associated with appellant's mark, or appellant's asserted restriction of sales to an exclusive boutique in Tuxedo Park, New York, are considerations similarly irrelevant to the question of registrability of appellant's mark when such limitations are not inherent in marketing of the goods or specifically set forth as limitations in the application. *The Wella Corp. v. California Concept Corp.,* 558 F.2d 1019, 194 USPQ 419 (CCPA 1977); *Sheraton Corp. of America v. Sheffield Watch, Inc.,* 480 F.2d 1400, 178 USPQ 468 (CCPA 1973); *Norton Co. v. Bear Mfg. Co.,* 58 CCPA 981, 438 F.2d 620, 169 USPQ 44 (1971).

Here, appellant seeks to register the word MONOPOLY as its mark without any restrictions reflecting the facts in its actual use which it argues on this appeal prevent likelihood of confusion. We cannot take such facts into consideration unless set forth in its application. *Toro Co. v. Hardigg Industries, Inc.,* 549 F.2d 785, 790, 193 USPQ 149, 155 (CCPA 1977).

Finally, appellant asserts that the board ignored "a record which indicates appellee's specific lack of interest in collateral exploitation of its own 'famous mark'." Lack of present intent to expand use of one's mark is not an overriding consideration. *American Drill Bushing Co. v. Rockwell Mfg. Co.,* 52 CCPA 1173, 342 F.2d 1019, 145 USPQ 144

(1965). We are unpersuaded that appellee's private intent would affect public reaction to seeing the mark used in the manner discussed above.

Accordingly, we affirm the opposition for the reasons indicated.

AFFIRMED.

MILLER, Judge, with whom BALDWIN, Judge, joins, dissenting.

I dissent because of errors of the board and errors in the majority opinion leading to an unwarranted monopoly on registration of "MONOPOLY."

*Proper Test*

The board sustained the opposition because "purchasers who encounter items of clothing bearing the trademark 'MONOPOLY', used with or without the game components, are likely to believe that, or at least wonder whether, the items originate from, or are approved by, or are in some way associated with opposer" or "would be much more likely to react to applicant's mark by thinking of opposer's familiar mark." Neither statement in its entirety expresses the correct test under section 2(d).[1] The test here is whether the trademark "MONOPOLY," registered by appellee for a game and its components in the Patent and Trademark Office on the principal register, is likely to cause confusion when applied by appellant to its wearing apparel. I agree with appellant that this test is not met.

*Imprecise Approach*

The basic premise of the opinions of both the board and the majority appears to be that the trademark "MONOPOLY" *alone* is famous. Their secondary premise (of which the board took, and the majority appears to take, judicial notice) is that famous marks are frequently used on collateral products. The majority indicates that the truth of its secondary premise is bolstered by appellee's

---

1. In *In re P. Ferrero & C.S.P.A.,* 479 F.2d 1395, 1397, 178 USPQ 167, 168 (CCPA 1973) (no likelihood of confusion between "TIC TAC" for candy and "TIC TAC TOE" for ice cream and sherbet), this court stated:

> The fact that one mark may bring another mark to mind does not in itself establish likelihood of confusion as to source.... The very fact of calling to mind may indicate that the mind is distinguishing, rather than being confused by, two marks.

actual collateral uses. From this it is concluded that purchasers would believe, when seeing the trademark "MONOPOLY" on a collateral product such as a T-shirt, that the product emanates in some fashion from appellee. There are fallacies in this analysis. First, the evidence does not establish that the trademark "MONOPOLY" *alone* is famous. The evidence only establishes that it is famous when used on games or with graphic displays of the game components on collateral products. Second, the only use under 15 U.S.C. § 1052(d) which can form the basis for an opposition is one which functions as an indication of quality control or source. Whether the use of famous marks on collateral products functions as an indication of quality control or source is a mixed question of law and fact that cannot be resolved by judicial notice. Third, the actual uses on collateral products have not in any instance been of "MONOPOLY" alone, but only in connection with graphic displays of the game components. Additionally, those actual uses referred to by the board and majority opinions frequently did not include either the term or the trademark "MONOPOLY." Further, the actual collateral uses of "MONOPOLY" were limited to tumblers, coasters, jigsaw puzzles, and rugs.[2] These products are not sufficiently related to clothing to warrant a finding of likelihood of confusion.

### Fame of Mark—Major Premise

The majority agrees with the board that "MONOPOLY" may properly be termed a "famous" mark. Indeed, the evidence establishes that the "MONOPOLY" *game* is famous and that the trademark when used for the *game* or with *graphic displays* of the

game components on collateral products is famous. However, beyond this evidence, the "famous" label does not warrant a monopoly on registration. It does not, ipso facto, create a presumption or inference of a likelihood of confusion. Nor does it justify the assumption that, regardless of the nature of the goods,[3] the public will always identify them with a particular source. In effect, the majority appears to be either inventing a federal antidilution doctrine or proposing to grant rights in gross for famous marks. However, the Lanham Act is not an antidilution statute. *Tiffany & Co. v. National Gypsum Co.*, 59 CCPA 1063, 1068, 459 F.2d 527, 530, 173 USPQ 793, 796 (1972). And there is no right in gross to prevent another from registering a mark that is famous, when applied by one entity to its goods or services, for use as an indication of source of, or quality control over, all other goods or services in the marketplace. *See United Drug Co. v. Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918).

### Judicial Notice—Secondary Premise

The board undertook to judicially recognize, and the majority opinion finds "no error in the board's conclusion," that "it is a matter of common knowledge that famous marks are frequently used on certain types of items, such as clothing, glassware, trash cans, pillows, etc., which are unrelated in nature to those goods on which the marks are normally used."[4] However, mere use of a term which, under certain circumstances, may function as an indication of quality control or source is not relevant to an opposition proceeding under 15 U.S.C. § 1052(d)

---

**2.** There was one unauthorized use on a T-shirt as part of a graphic display of the game components, which use was subsequently enjoined.

**3.** The concept of fame is one factor which bears on the strength of the mark. A strong mark is more likely than a weak mark to be remembered and more likely to be associated by the purchasing public with a greater breadth of goods or services. *See Dan Robbins & Associates, Inc. v. Questor Corp.*, 599 F.2d 1009, 1013, 202 USPQ 100, 104 (CCPA 1979); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276–77, 192 USPQ 555, 563–64 (CA 7 1976). When a famous mark, as applied to

certain goods or services, is not a coined term but has other common meanings, the strength of that mark is diluted in relation to other goods or services. *See American Can Co. v. Dixie Wax Paper Co.*, 56 CCPA 957, 407 F.2d 420, 160 USPQ 721 (1969) (fact that "DIXIE" was famous for paper cups did not support cancellation of and opposition to registration of "DIXIE" as part of a composite mark for waxed paper). In this instance, the term monopoly has other common meanings.

**4.** 204 USPQ at 400.

unless the particular term so functions with respect to the particular goods involved in the opposition. *See Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40 (CCPA 1981). Further, possible uses of famous marks in general are not relevant to the question of how the public would view appellant's use of "MONOPO-LY" in particular. As this court has said many times, each case must be decided on its own facts. *Faultless Starch Co. v. Sales Producers Associates, Inc.*, 530 F.2d 1400, 189 USPQ 141 (CCPA 1976); *Curtice-Burns, Inc. v. Northwest Sanitation Products, Inc.*, 530 F.2d 1396, 189 USPQ 138 (CCPA 1976).

Assuming that the use to which the board referred was intended to be limited to one which functions as an indication of quality control or source, taking judicial notice was also improper. Judicial notice is an evidentiary procedure for recognizing without proof the existence and truth of certain *facts* which are regarded as a matter of common knowledge or which could be instantly and unquestionably demonstrated. *The Wella Corp. v. California Concept Corp.*, 558 F.2d 1019, 1022 n.5, 194 USPQ 419, 422 n.5 (CCPA 1977); *In re Knapp-Monarch Co.*, 49 CCPA 779, 296 F.2d 230, 132 USPQ 6 (1961). That the use of famous marks on unrelated goods necessarily and always functions as an indication of quality control or source cannot be instantly and unquestionably demonstrated. Nor can recognition by the purchasing public that a graphic or pictorial display of a famous mark on goods is an indication of source rather than a commercially or artistically desirable pictorial representation or modern art form not having a source indicating function. *See In re Olin Corp.*, 181 USPQ 182 (TTAB 1973). In this case, there is a mixed question of law and fact (which cannot be resolved by judicial notice) over whether the term "monopoly" when and if it visibly appears on clothing and novelty items would serve as an indication of source. *See Toro Mfg. Corp. v. John B. Stetson Co.*, 161 USPQ 749 (TTAB 1969).

Further, the board should not have been concerned with speculative or general marketing techniques involving the trademark "MONOPOLY" that might be used by appellee. Rather, the board should have been concerned with specific actual use. Taking judicial notice simply forecloses the key inquiry in determining likelihood of confusion, namely: whether purchasers would be likely to expect that the actual use of the mark "MONOPOLY" *alone* on any of the goods specified in appellant's application is an indication of quality control or source reflecting a normal expansion by appellee of its line of goods. *Jackes-Evans Manufacturing Co. v. Jaybee Manufacturing Corp.*, 481 F.2d 1342, 179 USPQ 81 (CCPA 1973); *J. C. Hall Co. v. Hallmark Cards, Inc.*, 52 CCPA 981, 340 F.2d 960, 144 USPQ 435 (1965); *W. E. Kautenberg Co. v. Ekco Products Co.*, 45 CCPA 761, 251 F.2d 628, 116 USPQ 417 (1958).

*Likelihood of Confusion—Actual Collateral Uses*

The majority states, and I agree, that "likelihood of confusion must be found if the public . . . is likely to believe that appellee has expanded its use of the mark, directly or under a license, for such item." To determine whether such belief is likely, the court should focus on the actual manner in which opposer uses its mark and the actual goods to which it applies its mark. The majority points to "appellee's *licensing* of its mark *for use* on certain novelty items" (emphasis supplied) and testimony "that *requests have been received* by appellee for licenses to utilize its mark 'MONOP-OLY' on T-shirts (as well as other novelty clothing), and that it has acted against unauthorized use on such goods" (emphasis supplied). The licenses [5] and requests are not relevant. None of the requests for use on T-shirts or other clothing was granted. The only use on clothing was the unauthorized use on T-shirts which was successfully enjoined by appellee; and then only one T-shirt bore the term "monopoly" as part of a graphic display of the game components. All other T-shirts bore graphic displays of the game components alone.

Appellee has introduced evidence that it has *licensed* the use of "MONOPOLY" with

---

5. The actual use made under the license and not the license itself is relevant.

pictorial representations of the game components on rugs, tumblers, coasters, ice buckets, and trays and has sold jigsaw puzzles which, when assembled, depict appellee's game board. However, "MONOPOLY" does not appear on the ice buckets or trays; the label on the rug indicates that it was manufactured and distributed under a license from appellee; and there is no evidence that appellee has used "MONOPOLY" on any such goods separately from the pictorial representations of the game components.[6]

In each instance of collateral use by appellee and its licensees, purchasers have been confronted with pictorial representations of the game components with or without "MONOPOLY," but have never been confronted with uses by appellee of "MONOPOLY" separately from the pictorial representations. Nor have they been confronted with either pervasive or occasional uses of "MONOPOLY" on clothing or related goods.[7]

In view of the foregoing, I conclude that purchasers would not be likely to believe that the use on clothing of "MONOPOLY" *alone* was an indication of quality control or source reflecting a normal expansion by appellee of its line of goods; further, that any confusion resulting from the possibility that, at some time in the future, some purchasers of T-shirts, bearing "MONOPOLY" *alone*, would believe that appellee was the source of, or had quality control over, such goods would, at most, be *de minimis*. Accordingly, I would hold that appellant's use of the trademark "MONOPOLY" is not likely to cause confusion when applied by appellant to its goods.

6. Notwithstanding that appellee's corporate family has the capability of manufacturing clothing, from which one might speculate that the clothing line would be a natural area of expansion, this opportunity has not been exploited. To the contrary, appellee has consistently demonstrated an intent to not enter the clothing field when presented with requests for licenses. Although appellee's president testified that appellee has contemplated licensing the use of "MONOPOLY" and the game components on articles of clothing and jewelry, even assuming that this testimony was relevant, such use was not to be of "MONOPOLY" alone, but in connection with the pictorial representations of the game components.

7. I agree that appellant's application for registration is broad enough to include T-shirts emblazoned with the mark "MONOPOLY." However, as I perceive the strength of the mark "MONOPOLY," the possibility that appellant may use the mark on T-shirts is not relevant unless the opposer has actually used the mark on T-shirts or related goods. There must be a logical connecting link between the opposer's goods (games and novelty items) and the applicant's goods (clothing) which would be likely to lead purchasers to believe that they emanate from a common source. In *Dan Robbins & Associates, Inc. v. Questor Corp., supra* at 1013, 202 USPQ at 104, this court noted (regarding the famous "TINKERTOY" mark) that the "[opposer's] games, toys and children's building blocks, and [the applicant's] children's books, all have a common marketing environ-

ment, being sold generally in toy stores and toy departments of retail stores to the same purchasers." In *Tiffany & Co. v. Tiffany Tile Corp.*, 52 CCPA 1396, 1397, 345 F.2d 214, 215, 145 USPQ 483, 483 (1965) (opposer introduced forty-seven registrations of "TIFFANY" or Tiffany & Co. for a wide variety of household items to oppose registration of "TIFFANY" for ceramic tile), this court stated:

> We are not here dealing with such diverse products as bulldozers and cosmetics but with products that are, in the main, decorative in nature and appeal, made from the same basic material, and normally found and used in homes.

In *Tropic-Aire, Inc. v. Approved Products, Inc.*, 47 CCPA 928, 933, 275 F.2d 728, 731, 125 USPQ 182, 185 (1960), this court stated that due to the wide diversity of consumer products sold by opposer under the "TROPIC-AIRE" mark, it would be "more likely that purchasers would think that 'those "Tropic-Aire" people' had brought out another product" when confronted by the applicant's use of the same mark on household chemical deodorizers. In each of these cases, there was some logical connection between the goods to which identical marks were being applied. In this case, the only connection is one unauthorized use of the term monopoly as a part of a graphic display of the game components on a T-shirt and judicial notice by the board that famous marks are frequently used on collateral products such as clothing.