THIS DISPOSITION IS
CITABLE AS PRECEDENT
OF THE TTAB

Mailed: 6/21/06

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Jump Designs, LLC
_____

Serial No. 76393986
_____

Peter M. Falkenstein of Jaffe Rait Heuer & Weiss for Jump Designs, LLC.

Susan Stiglitz, Trademark Examining Attorney, Law Office 103 (Michael Hamilton, Managing Attorney).
_____

Before Quinn, Bucher and Walsh, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

An application was filed by Jump Designs, LLC to register the mark JUMP DESIGNS ("DESIGNS" disclaimed) for "furniture, and goods of various materials, not included in other classes, in the nature of furnishings, and decorative and functional appointments, for home, office and commercial settings, namely, armchairs, beds and bed frames, bookcases, cabinets, carts, chairs, chests of drawers, couches, deck chairs, desks, display racks, point of purchase displays, doors for furniture, plastic and wood

figurines, office furniture, living room furniture, bedroom furniture, lawn furniture, furniture moldings, plastic and wood sculptures, seats, tables, toy boxes, [and] toy chests."[1]

The trademark examining attorney refused registration under Section 2(d) of the Trademark Act on the ground that applicant's mark, when applied to applicant's goods, so resembles the previously registered mark JUMP for "desktop marker boards, desktop tack boards, clipboards, phone support trays; document supports for use with office furniture, namely, document file racks and trays, document support clips and holders, lap trays for writing, and support stands for supporting racks, trays, clips and desktop accessories; and desktop organizers" (in International Class 16); and "furniture, non-metal storage bins, and desktop picture frames" (in International Class 20),[2] as to be likely to cause confusion.

When the refusal was made final, applicant appealed. Applicant and the examining attorney have filed briefs.

Applicant initially contends that the Section 2(d)

---

[1] Application Serial No. 76393986, filed April 10, 2002, based on an allegation of a bona fide intention to use the mark in commerce. Applicant subsequently filed a statement of use setting forth a date of first use anywhere and a date of first use in commerce of July 1, 2003.
[2] Registration No. 2649803, issued November 12, 2002.

2

refusal was improperly made inasmuch as it came after issuance of a notice of allowance and applicant's filing of a statement of use. Applicant asserts the following:

> [T]he refusal to register--following the issuance of the Notice of Allowance--was procedurally defective, in that it raised no use-related arguments; cited no new evidence that had been unavailable to the examining attorney in her initial review; and was not based on the "clear error" standard for a refusal in a post-SOU posture. In the interim, Applicant had devoted substantial resources, both creative and financial, in bringing the Mark to the marketplace, only to be met by a belated, second-guess refusal to register, which, if sustained, would render all of Applicant's efforts and investment moot and cost the Applicant substantially. (Appeal Brief, p. 3)

Applicant goes on to contend that, in any event, its mark is not confusingly similar to the cited mark. More specifically, applicant argues that the marks are dissimilar, pointing out that the register already includes many third-party registrations of marks comprising, in whole or in part, the word JUMP. The presence of JUMP marks on the register, applicant asserts, serves to weaken the scope of protection to be accorded to registrant's mark. As to the goods, applicant argues only that they "are not identical." Applicant also contends that registrant only uses JUMP as part of the mark JUMP STUFF,

and that its review of registrant's website shows that there is no use of JUMP *per se*. In support of its position, applicant submitted a list of third-party registrations retrieved from the TESS database, copies of certain third-party registrations, and excerpts from its website, as well as from registrant's website.

The examining attorney asserts that in view of the abandonment of applicant's application and the subsequent revival thereof as a result of the grant of a petition to revive, a second search was conducted. The examining attorney contends that it would have been "clear error" not to cite registrant's mark against the involved application, and the refusal accordingly was made. Insofar as the substantive Section 2(d) refusal is concerned, the examining attorney states that the dominant feature of applicant's mark, namely the JUMP portion, is identical to the entirety of the cited mark. As to the goods, the examining attorney maintains that the goods are, in part, identical. Finally, the examining attorney objects to the untimely submission of certain exhibits attached to applicant's appeal brief. In support of the refusal, the examining attorney submitted a dictionary definition of "design"; excerpts retrieved from the NEXIS database showing the term "design(s)" used in connection with

4

furniture; and numerous use-based third-party registrations to show that the goods involved herein are of type that may emanate from a single source under a single mark.

Before turning to the merits of the appeal, there are evidentiary matters requiring our attention. In its November 29, 2004 response, applicant referred to three third-party JUMP and JUMP-formative registrations. The examining attorney, in her January 18, 2005 final refusal, indicated that the mere listing of the registrations was insufficient to make them of record. Applicant, with its appeal brief, submitted printouts of these registrations taken from the Office's TESS database, accompanied by printouts of six additional third-party registrations. Applicant further submitted with its appeal brief a list (rather than complete registration information) retrieved from the TESS database showing hundreds of third-party JUMP and JUMP-formative registered marks and applied-for marks. This printout shows only the registration number and/or application number and the mark, and whether the registration or application is "live" or "dead." The examining attorney, in her brief, indicated that the evidence accompanying applicant's brief was not timely made of record. However, she went on to state that she did not object, in spite of the untimely submission, to the copies

of the nine third-party registrations. Accordingly, the TESS printouts of the nine third-party registrations are considered part of the record for determining the merits of this appeal.

With respect to the TESS printout consisting of only a list of third-party registrations, this submission, as pointed out by the examining attorney, is untimely. Trademark Rule 2.142(d) states that the record in an application should be complete prior to the filing of an appeal. Moreover, the mere submission of a listing from the TESS database is insufficient to make the referenced registrations of record. To make a third-party registration of record, a copy of the registration, either a copy of the paper USPTO record, or a copy taken from the electronic records of the Office, should be submitted. In re Volvo Cars of North America Inc., 46 USPQ2d 1455, 1456 n. 2 (TTAB 1998). See TBMP § 1208.02 (2d ed. rev. 2004). Accordingly, the list retrieved from the TESS database has not been considered. We hasten to add that, in any event, the list would not compel a different result in this case. The list does not show the goods and/or services covered by the registrations. Therefore, it has extremely limited probative value, since we cannot determine whether the marks are for goods and services similar to those of

6

applicant and registrant. In this connection, even complete copies of third-party registrations covering goods and/or services far removed from the goods of applicant and registrant would be irrelevant to the present likelihood of confusion analysis. See Conde Nast Publications, Inc. v. American Greetings Corp., 329 F.2d 1012, 141 USPQ 249, 252 (CCPA 1964).

As to the Internet evidence, certain pages from applicant's and registrant's websites were timely submitted during the prosecution phase. These have been considered in making our decision. Applicant, in connection with its argument that registrant does not actually use the mark JUMP *per se*, also relied upon additional pages retrieved from registrant's website, as well as from the websites of certain vendors of registrant's goods. This evidence was submitted for the first time with the appeal brief, and the examining attorney objected to its untimely submission. The objection is sustained, and the additional evidence has not been considered. Trademark Rule 2.142(d). Even if considered, however, the evidence is irrelevant to our determination in this appeal (see discussion, infra).

We now turn to the procedural point raised by applicant. Applicant claims that the refusal is "procedurally defective" because the Section 2(d) refusal

was made belatedly after issuance of the notice of

allowance and submission of its statement of use; and that

the examining attorney did not indicate that the failure to

issue the refusal would be a "clear error" or that the

refusal was based on use-related issues.[3]  Applicant

contends that the examining attorney should not be allowed

"a second bite of the apple."  In making its arguments,

applicant also states the following:

> Applicant is aware that challenges to
> the application of the clear error
> standard must be brought by way of
> petition to the Director.  (TMEP §
> 1109.08.)  Here, however, because there
> is no assertion in the Office Action
> that the refusal to register was based
> on application of the clear error
> standard, there is no basis to petition
> the Director.  Applicant cannot be
> expected to read the mind of the
> examining attorney and create an issue
> to contest that is not raised by the
> Office Action itself.  (Appeal Brief,
> p. 5, n. 3)

Applicant is correct in stating that the Office action

dated June 8, 2004, wherein the Section 2(d) refusal was

raised for the first time, did not mention "clear error."

The examining attorney merely stated the following:  "This

letter responds to the Applicant's Petition to Revive and

---

[3] As already noted, the examining attorney conducted a second
search after the application was revived following the grant of a
petition to revive.  See TMEP § 718.08 (4th ed. 2005).

8

Statement of Use. The Applicant's Petition to Revive has been granted; accordingly, examination is resumed. Please see below for a new issue." The examining attorney then went on to raise the Section 2(d) refusal.

The fact that there was not a statement in the Office action that the Section 2(d) refusal was made under the "clear error" standard does not excuse applicant for its failure to follow the proper procedure in seeking review.[4] Given the procedural posture of the application, it should have been obvious to applicant that the examining attorney made the Section 2(d) refusal under the "clear error" standard. See TMEP § 1109.08 (4th ed. 2005) ["The Office will not issue any refusal under § 2(d) in the examination of the statement of use unless the failure to issue the refusal constitutes a clear error."].

In any event, the Board has in the past stated that questions involving the applicability of the "clear error" standard are the subject matter of a petition to the Director, and are not proper for consideration by way of an appeal to the Board. In the case of In re Sambado & Son

---

[4] Because the Trademark Rules of Practice do not provide an express deadline to cover the present situation, applicant was required to file any petition within two months of the date of mailing of the Office action wherein the Section 2(d) refusal was first raised. Trademark Rule 2.146(d). See also TMEP § 1705.04 (4th ed. 2005).

Inc., 45 USPQ2d 1312, 1314-15 (TTAB 1997), the Board

stated:

> [T]he question of whether the clear error standard was properly applied is a procedural one arising out of examination practice.  The Examination Organization makes the determination of "clear error," which determination ultimately is properly reviewable on petition to the Commissioner.  The Board's determination on appeal is to be limited to the correctness of the underlying substantive refusal to register.  The Board will not second guess the Examining Organization's procedural determination, that is, the latter's application of the "clear error" standard.  As noted, the application of the "clear error" standard is, in this context, a procedural decision (one that answers the question, "Should a new refusal be made and defended by the Examining Attorney?").
>
> *****
>
> We recognize that this leaves applicant without an answer to the question of whether, in this case, the Examining Attorney properly applied the "clear error" standard.  However, applicant itself did not take advantage of the proper procedure for review of the "clear error" determination.  As noted above, applicant's petition was dismissed as premature, having been taken from a nonfinal action.  Thus, the proper procedure would have been for applicant to file a petition after issuance of the final refusal. Applicant failed to do so, and the Board will not, on this appeal, review the Examining Attorney's application of the "clear error" standard.

In addition, TMEP § 1109.08 (4th ed. 2005) provides that the Board, on appeal, "will review only the correctness of the underlying substantive refusal of registration.  The Board will not second-guess the application of the 'clear error' standard.  The question of whether the examining attorney properly applied the 'clear error' standard is reviewable on petition under 37 C.F.R. §2.146."

In view of the above, the Board will not consider the merits of applicant's argument that the refusal is procedurally deficient under the "clear error" standard.

We now turn to consider the substantive refusal of registration under Section 2(d).  Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  See also: In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).  In any likelihood of confusion analysis, however, two key considerations are the similarities between the marks and the similarities between the goods.  See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).  See also:  In

11

re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

Insofar as the goods are concerned, it is well settled that the question of likelihood of confusion must be determined based on an analysis of the goods recited in applicant's application vis-à-vis the goods identified in the cited registration. In re Shell Oil Co., 992 F.2d 1204, 26 USPQ2d 1687, 1690 n. 4 (Fed. Cir. 1993); and Canadian Imperial Bank v. Wells Fargo Bank, 811 F.2d 1490, 1 USPQ2d 1783 (Fed. Cir. 1992). Where the goods in the application at issue and/or in the cited registration are broadly identified as to their nature and type, such that there is an absence of any restrictions as to the channels of trade and no limitation as to the classes of purchasers, it is presumed that in scope the identification of goods encompasses not only all the goods of the nature and type described therein, but that the identified goods are offered in all channels of trade which would be normal therefor, and that they would be purchased by all potential buyers thereof. In re Elbaum, 211 USPQ 639, 640 (TTAB 1981). Further, it is not necessary that the respective goods be identical or competitive, or even that they move in the same channels of trade to support a holding of likelihood of confusion. It is sufficient that the

12

respective goods are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originated from the same producer. In re Melville Corp., 18 USPQ2d 1386 (TTAB 1991).

In comparing the goods, we focus our attention on the fact that both applicant's and registrant's identifications of goods include "furniture." Applicant's attempt to distinguish its furniture from registrant's furniture is to no avail. Registrant's furniture is not limited in any way as to nature, type, use or purpose and, thus, is broad enough to encompass the type of furniture sold by applicant. When construed as such, the goods are, in part, legally identical. Likelihood of confusion must be found if there is likelihood of confusion involving *any item* that comes within the identification of goods in the involved application. Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981). It is therefore unnecessary to rule as to whether each of the other items set forth in the involved application are so

related to those in the cited registration that confusion

would be likely.[5]

Given that applicant's and registrant's "furniture" is

legally identical, we assume that these goods travel in the

same channels of trade (e.g., retail furniture stores), and

that the same classes of purchasers buy these goods.

We next turn to consider the marks. In determining

the similarity or dissimilarity of the marks, we must

compare the marks in their entireties as to appearance,

sound, connotation and commercial impression. Palm Bay

Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En

1772, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). The

test is not whether the marks can be distinguished when

subjected to a side-by-side comparison, but rather whether

the marks are sufficiently similar in their entireties that

confusion as to the source of the goods offered under the

respective marks is likely to result. The focus is on the

---

[5] We note, however, that some of the goods are related. In particular, applicant's identification includes items such as office furniture and desks, while registrant's identification includes desk accessories and other items for use with office furniture. In this connection, the examining attorney introduced numerous use-based third-party registrations showing that each of those registrants adopted a single mark for these types of goods. Third-party registrations that individually cover different items and that are based on use in commerce serve to suggest that the listed goods and/or services are of a type that may emanate from a single source. See In re Albert Trostel & Sons Co., 29 USPQ2d 1783 (TTAB 1993); and In re Mucky Duck Mustard Co. Inc., 6 USPQ2d 1467 (TTAB 1988).

recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. Finally, where, as in the present case, the marks appear on, at least in part, legally identical goods, the degree of similarity between the marks that is necessary to support a finding of likely confusion declines. Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

The marks involved herein, JUMP and JUMP DESIGNS, are similar in sound, appearance, meaning and overall commercial impression. Both begin with the identical, arbitrary term JUMP, and applicant has merely added a descriptive, disclaimed term to its mark. The term "design" is defined, in pertinent part, as "the purposeful or inventive arrangement of parts or details: furniture of simple but elegant design; something designed, especially a decorative or an artistic work; an ornamental pattern." The American Heritage Dictionary of the English Language (3d ed. 1992). The descriptiveness of the term "design(s)" when used in connection with furniture is further evidenced by the NEXIS excerpts showing widespread use of the term in describing furniture. This use is consistent with the commonly understood meaning of the term cited above. Given the descriptiveness of this term for applicant's goods, and

15

the fact that it has been disclaimed, the additional word "DESIGNS" in applicant's mark does not serve to distinguish it from registrant's mark. The general rule is that a subsequent user may not appropriate the entire mark of another and avoid a likelihood of confusion by adding descriptive or subordinate matter thereto. Thus, "if the dominant portion of both marks is the same, the confusion may be likely notwithstanding peripheral differences." TMEP § 1207.01 (b)(iii) (4th ed. 2005). See, e.g., Hewlett-Packard Co. v. Packard Press Inc., 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002) [HEWLETT PACKARD and PACKARD TECHNOLOGIES]; In re El Torito Restaurants Inc., 9 USPQ2d 2002 (TTAB 1988) [MACHO and MACHO COMBOS]; In re Equitable Bancorporation, 229 USPQ 709 (TTAB 1986) [RESPONSE and RESPONSE CARD]; and In re Corning Glass Works, 229 USPQ 65 (TTAB 1985) [CONFIRM and CONFIRMCELLS]. The present case is no exception.

In comparing the marks, we have not ignored the descriptive and disclaimed "DESIGNS" portion of applicant's mark. Indeed, we have considered applicant's mark JUMP DESIGNS in its entirety, and find that this mark is substantially similar to registrant's mark JUMP in sound, appearance, meaning and commercial impression.

16

In attempting to distinguish the marks, applicant points to the existence of nine third-party registrations of JUMP and JUMP-formative marks. Applicant essentially argues that if these three respective "sets" of JUMP marks (each "set" covering goods and/or services that are, according to applicant, related and in the same field) can coexist on the register, then applicant's and registrant's marks likewise can coexist without likelihood of confusion.

The third-party registration evidence does not persuade us that confusion is not likely. Firstly, the registrations are not evidence of use of the marks shown therein. Thus, they are not proof that consumers are familiar with such marks so as to be accustomed to the existence of similar marks in the marketplace, and as a result are able to distinguish between the JUMP marks based on slight differences between them. Smith Bros. Mfg. Co. v. Stone Mfg. Co., 476 F.2d 1004, 177 USPQ 462 (CCPA 1973); and Richardson-Vicks, Inc. v. Franklin Mint Corp., 216 USPQ 989 (TTAB 1982). Secondly, and more significantly, the three "sets" of registrations are for 1) computer-type services, 2) beverages, and 3) athletic shoes, which goods/services are not even remotely related to the goods involved herein. See Spoons Restaurants Inc. v. Morrison Inc., 23 USPQ2d 1735, 1740 (TTAB 1991), *aff'd unpub.*,

17

(Appeal No. 92-1086, Fed. Cir., June 5, 1992). The fact that these registrations for goods and services in other fields may coexist is of no moment. As the examining attorney stated, "[t]he fact that a mark may be weak enough in one field to permit the registration of similar marks does not mean that the same mark must necessarily be registered in all other fields and for all other goods and services." (Brief, p. 7). The record before us shows that the only JUMP mark registered in the furniture field is registrant's mark.

With respect to conditions of sale, we recognize that some furniture items may be expensive and are bought after deliberation. On the other hand, the identification of "furniture" in both the application and registration can encompass inexpensive furniture items that may be purchased on impulse or without great care. While there is no evidence on this du Pont factor, even assuming that purchases are carefully made, we find that the substantial similarity of the marks and the identity of the goods clearly outweigh any sophisticated purchasing decision. See HRL Associates, Inc. v. Weiss Associates, Inc., 12 USPQ2d 1819 (TTAB 1989), *aff'd*, Weiss Associates, Inc. v. HRL Associates, Inc., 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990) [similarities of goods and marks outweigh

18

sophisticated purchasers, careful purchasing decision, and expensive goods].

Applicant also attacks the registered mark by arguing that registrant actually uses the mark JUMP STUFF, and not the registered mark JUMP. Applicant's allegations constitute an impermissible collateral attack on registrant's registration. Section 7(b) of the Trademark Act provides that a certificate of registration on the Principal Register shall be *prima facie* evidence of the validity of the registration, of the registrant's ownership of the mark and of the registrant's exclusive right to use the mark in connection with the goods or services identified in the certificate. During ex parte prosecution, including an ex parte appeal, an applicant will not be heard on matters that constitute a collateral attack on the cited registration (e.g., a registrant's nonuse of the mark). In re Dixie Restaurants, 41 USPQ2d at 1534; and In re Peebles Inc., 23 USPQ2d 1795, 1797 n. 5 (TTAB 1992). See TMEP § 1207.01(d)(iv) (4th ed. 2005). We would add that, in any event, we are bound to consider the mark in the cited registration, JUMP, and not any other mark which registrant may or may not also use. Accordingly, no consideration has been given to applicant's arguments in this regard.

We conclude that consumers familiar with registrant's furniture and desktop accessories sold under its arbitrary mark JUMP would be likely to believe, upon encountering applicant's various items of furniture and decorative and functional appointments for home, office and commercial settings sold under the mark JUMP DESIGNS, that the goods originated with or are somehow associated with or sponsored by the same entity.

Lastly, to the extent that any of the points raised by applicant raise a doubt about likelihood of confusion, that doubt is required to be resolved in favor of the prior registrant. In re Hyper Shoppes (Ohio), Inc., 837 F.2d 840, 6 USPQ2d 1025 (Fed. Cir. 1988); and In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984).

**Decision:** The refusal to register is affirmed.