THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
January 4, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Max Capital Group Ltd.
_____

Serial No. 77186166
_____

Karol A. Kepchar, David C. Lee, Lesia O. Skrypoczka and
Laura T. Geyer of Akin Gump Strauss Hauer & Feld LLP for
Max Capital Group Ltd.

Asmat Khan, Trademark Examining Attorney, Law Office 114
(K. Margaret Le, Managing Attorney)
_____

Before Seeherman, Quinn and Bergsman, Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Max Capital Group Ltd. has appealed from the final
refusal of the trademark examining attorney to register MAX
and design, as shown below, for "insurance services,
namely, writing property and casualty insurance and
reinsurance; life, health, and annuity reinsurance
underwriting; specialty insurance underwriting, namely,
property catastrophe reinsurance, aviation reinsurance,

marine reinsurance, and energy reinsurance underwriting; and excess and surplus insurance services, namely, property, inland marine, casualty, excess liability and umbrella insurance underwriting."[1]



Registration has been refused pursuant to Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that applicant's mark so resembles the registered marks MAX (typed drawing)[2] and MAX and design, shown below,[3] owned by the same entity and registered for "underwriting of property and casualty insurance" that, as used in connection with applicant's identified services, it is likely to cause confusion or mistake or to deceive.



---

[1] Application Serial No. 77186166, filed May 21, 2007, and asserting first use and first use in commerce as early as May 2007.
[2] Registration No. 2866938, issued July 27, 2004.
[3] Registration No. 3108696, issued June 27, 2006.

The appeal has been fully briefed.[4]

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). See also, In re Majestic Distilling Co., Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. See Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). See also, In re Dixie Restaurants Inc., 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997).

---

[4] In its appeal brief applicant makes reference to a third-party registration that it states issued after the filing of applicant's request for reconsideration (and notice of appeal), and has submitted with its reply brief a copy of the registration, taken from the USPTO's TARR database. Trademark Rule 2.142(d) provides that the record in an application should be complete prior to the filing of an appeal. If applicant had wished to make this registration of record, it had the opportunity to file a request for remand, and it did not. Further, because the examining attorney did not discuss the registration in his brief, the examining attorney cannot be deemed to have stipulated the evidence into the record. Accordingly, this registration has not been considered.

Applicant has objected to third-party registrations submitted by the examining attorney for the first time with his brief. This evidence, too, is untimely, and has not been considered.

We add that even if all of the materials submitted with applicant's and the examining attorney's briefs had been properly made of record, they would not affect our decision herein.

At the very least, the "writing property and casualty insurance" identified in the applicant's application must be considered to be legally identical to the "underwriting of property and casualty insurance" identified in the cited registrations. The examining attorney has also submitted third-party registrations showing the relatedness of the other insurance services in applicant's application and the cited registration, but in view of these legally identical services, there is no need for us to discuss this additional evidence. See Tuxedo Monopoly, Inc. v. General Mills Fun Group, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (likelihood of confusion must be found if there is likely to be confusion with respect to any item that comes within the identification of goods or services in the application). Based on the legally identical nature of the services as identified in the application and registrations, the du Pont factor of the similarity of the services heavily favors a finding of likelihood of confusion. Further, because the services are legally identical, they must be presumed to travel in the same channels of trade and be rendered or offered to the same classes of consumers. See Hewlett-Packard Co. v. Packard Press, Inc., 281 F.3d 1261, 1268, 62 USPQ2d 1001 (Fed. Cir. 2002); Squirtco v. Tomy Corp., 697 F.2d 1038, 1042- 43, 216

4

USPQ 937, 940 (Fed. Cir. 1983)("[I]n the absence of specific limitations in the registration, the court assumes use of the mark will include all normal and usual channels of trade and methods of distribution.").

We next consider the similarities of the marks. Because the design element in the cited MAX and design mark arguably contains an additional point of difference with applicant's mark, we confine our analysis to the issue of likelihood of confusion between applicant's mark and the cited registration for MAX in typed drawing form. That is, if confusion is likely between those marks, there is no need for us to consider the likelihood of confusion with the cited mark for MAX with the dot design, while if there is no likelihood of confusion between applicant's mark and MAX in typed form, then there would be no likelihood of confusion with the MAX and dot design mark.

In considering whether the similarity of the marks factor favors a finding of likelihood of confusion, a major issue is the strength of the cited mark, since the marks are obviously extremely similar, with the applicant's mark consisting of the identical word MAX, to which a design element of a pillar has been added. It is this pillar design, coupled with the weakness of the word MAX, which applicant asserts is sufficient to distinguish the marks.

5

In order to show that the registrant's mark MAX is weak, applicant has submitted a large number of third-party registrations, as well as Internet evidence which purports to show third-party use of MAX marks. The third-party registrations do not prove that the marks depicted therein are in use, although they can be used in the manner of dictionary definitions, in order to show that a term has been adopted because it has a significance in a particular industry. See Mead Johnson & Co. v. Peter Eckes, 195 USPQ 187 (TTAB 1977). In this case, the registrations confirm the dictionary meaning submitted by applicant, namely, that "max" is defined as a slang term for "maximum."[5]

As for the Internet evidence, although applicant submitted well over 300 pages of material, much of it is unhelpful. Many of the pages seem to be duplicative. Others are for marks or for corporate names that use "Maximum" or variations thereof, rather than MAX. See, for example, webpages for "Maximum Corporation," (url illegible); and MAXUM SPECIALTY INSURANCE GROUP, www.mxmsig.com. Many of the listings are for people (presumably insurance agents) who have the given name "Max." See listings in yellowpages.com for "Allstate Insurance Company-Max Ramsey"; "Farmers Insurance Group Max

---

[5] Webster's New World Dictionary, 3d coll. ed.

6

Rodriguez"; and "Allstate Insurance Company-Marcus 'Max' Pizano." Another grouping of webpages, entitled "Max Car Insurance," appears to be a "List of Agents in Max, North Dakota." www.calculateme.com. Other webpages appear to be in fields that are different from the insurance services that are identified in the cited registration and, for that matter, in applicant's application. For example, there are webpages for Max Value Realty, www.maxvaluere.com; Max Financial Group, www.merchantcircle.com; Agri-Max Financial for funding for agribusiness owners, www.agri-financial.com; and MaxValue.com for "courses and assistance in decision making analysis for maximizing investments." Thus, this evidence does not show that consumers are so used to seeing MAX marks for the insurance services identified in the cited registration and application that they would look to other elements in the marks to distinguish them. Similarly, webpages for "Maxima Pojistovna, a.s." (url missing) describe an insurance company that is stated to operate in the Baltic states. Although in certain circumstances we have considered websites for foreign entities, see In re International Business Machines Corp., 81 USPQ2d 1677, 1681 n.7 (TTAB 2006), there is no reason to believe that when it comes to

insurance services consumers would be aware of a company that is located and operates only in Europe.[6]

Although characterized as third-party use, applicant has also included uses by itself and the registrant. See applicant's description of pages submitted under Tab A. Such evidence does not address the du Pont factor of third-party use.

Many of the pages applicant has submitted are simply Google search summary sheets. "Search engine results—which provide little context to discern how a term is actually used on the webpage that can be accessed through the search result link—-may be insufficient to determine the nature of the use of a term or the relevance of the search results to registration considerations." In re Bayer Aktiengesellschaft, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007). In this case, even a cursory review of the summaries show that they contain many irrelevant listings, or listings from which we cannot ascertain for what goods or services the term MAX may be used, or which do not appear to be involved in the insurance field.

---

[6] We also point out it is preferable that material obtained from the Internet should be identified by the full address (url) for the webpage and the date it was downloaded, either by the information printed on the webpage itself, or by providing this information in an Office action or an applicant's response. See In re International Business Machines Corp., 81 USPQ2d 1677, 1682 n.9 (TTAB 2006).

Further, they do not show that third parties actually use MAX as a mark, or how consumers might encounter any such third-party uses.

The Board has frequently stated, in connection with the submission of articles retrieved by a NEXIS search, that it is not necessary that all articles be submitted, and the Board discourages submissions that are unnecessarily redundant or not probative. See TBMP § 1208.01; In re Couture, 60 USPQ2d 1317, 1318 n.2 (TTAB 1999) (many excerpts of articles retrieved by NEXIS search were repetitive or used the searched term for services not related to the applicant's); and In re Lamb-Weston Inc., 54 USPQ2d 1190, 1192 (TTAB 2000) (articles which bear no relationship to applicant's goods are irrelevant). The same is true for materials retrieved through Internet searches. Thus, it is important that applicants and examining attorneys carefully consider the materials retrieved by their Internet searches and make a judicious submission of the results.

We must also comment not only about the sheer number of pages submitted by applicant, but the fact that applicant has not even pointed out in its brief the specific Internet evidence that it believes is most probative of its position. The Board frowns equally upon

9

an applicant or examining attorney submitting hundreds of pages of evidence in the hope that as the Board wades through it we will find something that is probative. When they believe that it is necessary to submit a significant amount of such material, it is incumbent on the applicant and the examining attorney to specify in their briefs those pieces of evidence that they believe are most persuasive of their respective positions, so that the Board can consider that evidence in particular.

Although we cannot ascertain from applicant's arguments what evidence it believes is most probative, and therefore cannot discuss it in particular, we do acknowledge that there are some instances in which MAX is used by third parties in connection with insurance services. However, many of these uses include other strong identifying elements. For example, a mark used by New York Life is a logo that combines the word MAX with a design on one side of the word, NEW YORK LIFE in a box on the other side, and the words LIFE INSURANCE below, with a line under all the words and design elements, thus creating the look of a single logo. www.maxnewyorklife.com. Another website, www.maxvisioncare.com, shows the mark MVC with the company name "Max Vision Care, Inc." below it. It appears

to be for vision insurance and vision plans.    Another

lists H-E-B Max Pet Insurance.

In summary, we can conclude from the third-party

registrations, as well as the dictionary definition of

"max," that MAX has a suggestive meaning and therefore the

cited registration is not entitled to a broad scope of

protection.  However, as the examining attorney has pointed

out, even suggestive or weak marks are entitled to

protection from the use of a very similar mark for legally

identical services.  See In re Chica Inc., 84 USPQ2d 1845,

1850 (TTAB 2007), quoting In re Colonial Stores, 216 USPQ

793, 795 (TTAB 1982):

> if the word CORAZON, and its English
> translation, was considered to be
> highly suggestive of jewelry, it
> nonetheless is entitled to protection
> from the use of a very similar mark on
> jewelry products. "[E]ven weak marks
> are entitled to protection against
> registration of similar marks,
> especially identical ones, for related
> goods and services."

As for the evidence of third-party use, the evidence

is insufficient for us to find that consumers are so used

to seeing marks containing the word MAX for insurance

services of the types identified in applicant's application

and the cited registration that, when a design element (as

opposed to a house mark or additional word or company name)

11

is added to the word MAX, consumers will look to the design element to distinguish the marks.

With that in mind, we consider the marks. As noted, the cited mark is MAX and applicant's mark consists of the word MAX with a pillar design. Thus, the word parts of the mark are identical, and the marks are identical in pronunciation. We also find that the marks are identical in connotation. Applicant has argued that its mark suggests "longevity, stability, and reliability, along with the intellectual prestige associated with classical architecture and culture," brief, pp. 4-5, basing this argument on the "classical Latin derivation" of MAX (because "max" is derived from "maximum," and "maximum" is a Latin term) and the design element of the mark, which applicant characterizes as a classical column. On the other hand, applicant also asserts that the cited mark is merely an acronym for the name of the registrant, "Mutual Aid Exchange." We are not persuaded by either argument. With respect to the connotation of the cited mark, whether or not applicant is correct in how the mark was derived, and there is no evidence to show this, the mark itself would be perceived as the word MAX, rather than as an abbreviation for applicant's company name, because it is not depicted with periods or anything that would indicate

12

that MAX stands for the initials of "Mutual" and "Aid" and
an abbreviation for "Exchange." See In re Burroughs Corp.,
2 USPQ2d 1532, 1533 n.2 (TTAB 1986); Varian Associates,
Inc. v. Leybold-Heraeus Gesellschaft mit Beschrankter
Haftung, 219 USPQ 829, 833 (TTAB 1983) ("derivation
generally has little value in relation to the question
whether purchasers are or are not likely to be confused in
the marketplace"). Nor do we believe that applicant's
inclusion of a classical column design somehow transmutes
the English word "max," which applicant's own evidence
shows to be a recognized slang abbreviation for the English
word "maximum," into something suggesting "intellectual
prestige associated with classical architecture and
culture." Although "maximum" may be derived from Latin,
the evidence clearly shows that it is an English word, and
the abbreviation "max" is a slang term that, if anything,
would not have the formal suggestion of the Latin language.
Rather, as used in both marks, the word MAX would have the
same meaning, and the marks overall have the same
connotation.

The primary question is whether, as noted above, the
difference in appearance caused by the design element in
applicant's mark is sufficient to distinguish its mark from
the cited mark. Both applicant and the examining attorney

13

acknowledge the well-established principle that there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); see also Dixie Rest., 105 F.3d at 1407, 41 USPQ2d 1531 (affirming TTAB finding that DELTA was the dominant feature of the mark THE DELTA CAFE and design, and that the design element and generic word "CAFE" were insufficient to overcome likelihood of confusion with the registered mark DELTA). Applicant argues that because MAX has a suggestive connotation, the design element is the dominant part of its mark, and should be given more weight in the likelihood of confusion analysis. The examining attorney, on the other hand, argues that the word MAX, as the part of the mark that can be spoken, is entitled to greater weight, noting that if a mark comprises both a word and a design, then the word is normally accorded greater weight because it would be used by purchasers to request the goods or services. In re Appetito Provisions Co., 3 USPQ2d 1553 (TTAB 1987).

We conclude that the MAX portion of applicant's mark is the dominant portion and is entitled to greater weight.

Although MAX has a suggestive connotation, it is not without trademark significance. Further, it is by this term that consumers would refer to applicant's services. See id.; see also CBS Inc. v. Morrow, 708 F.2d 1579, 1581-1582, 218 USPQ 198 (Fed. Cir. 1983); Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1570, 218 USPQ 390, 395-396 (Fed. Cir. 1983). A customer that has been satisfied with applicant's services would recommend them by calling them MAX insurance services, not "the mark that has the classical column design" or "MAX with the classical column design." Further, the column design is not so unusual that consumers would find it an arresting or eye-catching feature. Compare, Parfums de Coeur Ltd. v. Lazarus, 83 USPQ2d 1012 (TTAB 2007) (the design in the mark BODYMAN and design is the dominant part of the mark because it is a large design of a grotesque image that has a strong visual impact, catching the eye and engaging the viewer before the viewer looks at the word BODYMAN).

Applicant's addition of a column design to the cited mark MAX is not sufficient to convey that these marks, MAX and MAX and design, identify different sources for legally identical insurance services.[7] When marks would appear on

_____

[7] We do not suggest that the mark MAX is so strong that any mark for insurance services that includes this term would be found

virtually identical goods or services, as is the case here, the degree of similarity necessary to support a conclusion of likely confusion declines. Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992). Consumers familiar with the registrant's MAX mark are likely to believe, upon seeing applicant's MAX and design mark for legally identical services, that the registrant has adopted a variation of its original MAX mark for such services.

Overall the marks convey the same commercial impression, and we find that the du Pont factor of the similarity of the marks favors a finding of likelihood of confusion.

The next du Pont factor we consider is the conditions of purchase. Applicant argues that the purchasers of insurance are careful, and we agree that by the very nature of such services, consumers would exercise care in obtaining them. While this factor favors applicant, it is outweighed by the similarity of the marks and the identity of the services. That is, the marks are so similar that even careful consumers who note the design element in

likely to cause confusion. Our decision herein is only that the design element in applicant's mark is not sufficient to distinguish the marks.

applicant's mark are likely to believe, as discussed above, that the mark is a variation of the registrant's mark, identifying insurance services that emanate from the same source.

Applicant has also argued that various MAX marks coexist on the register. Long-standing precedent establishes that third-party registrations cannot assist an applicant in registering a mark that is likely to cause confusion with a previously registered mark. As the Board stated in In re Chica Inc, 84 USPQ2d at 1849:

> {A]n applicant does not overcome a likelihood of confusion refusal by pointing to other registrations and arguing that they are as similar to the cited registration as applicant's mark. While third-party registrations may be used to demonstrate that a portion of a mark is suggestive or descriptive, they "cannot justify the registration of another confusingly similar mark." *In re J.M. Originals Inc.*, 6 USPQ2d 1393, 1394 (TTAB 1987), *quoting Plus Products v. Star-Kist Foods, Inc.*, 220 USPQ 541, 544 (TTAB 1983).

See also, AMF Inc. v. American Leisure Producs, Inc., 474 F.2d 1403, 1406, 177 USPQ 268, 269 (CCPA 1973) Lilly Pulitzer, Inc. v. Lilli Ann Corp., 376 F.2d 324, 325, 153 USPQ 406, 407 (CCPA 1967); In re Helene Curtis Indus., Inc., 305 F.2d 492, 494, 134 USPQ 501, 503 (CCPA 1962).

We have confined our discussion to the du Pont factors on which applicant and the examining attorney have submitted evidence and argument.  To the extent that any other factors are applicable, we treat them as neutral.

After considering all of the applicable du Pont factors, we find that applicant's mark for its identified services is likely to cause confusion with cited Registration No. 2866938 for MAX.  In view of this finding, we need not consider whether applicant's use of its mark is likely to cause confusion with Registration No. 3108696 for MAX and dot design.

Decision:  The refusal of registration on the basis of Registration No. 2866938 is affirmed.