This Opinion is a
Precedent of the TTAB

Mailed: December 20, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*Mahender Sabhnani*

*v.*

*Mirage Brands, LLC*

———

Cancellation No. 92068086

———

Sam P. Israel of Sam P. Israel, P.C. for Mahender Sabhnani.

Robert J. Schoenberg and Wendi Opper Uzar of Riker Danzig Scherer Hyland &
     Perretti LLP for Mirage Brands, LLC.

———

Before Larkin, Hudis, and Johnson,
     Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Mirage Brands, LLC ("Respondent" or "Mirage Brands") owns Registration No.

5394192 (the "'192 Registration") on the Principal Register of the standard character

mark MIRAGE BRANDS (BRANDS disclaimed) for "Perfumes and colognes" in

International Class 3,[1] and Registration No. 5367885 (the "'885 Registration") on the

---

[1] The '192 Registration issued on February 6, 2018.

Principal Register of the composite word-and-design mark shown below (BRANDS disclaimed) for "Perfumes and colognes" in International Class 3:



Mahender Sabhnani ("Petitioner") has petitioned to cancel the '192 and '885 Registrations under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Respondent's marks so resemble Petitioner's mark shown below



---

[2] The '885 Registration issued on January 2, 2018. The '885 Registration includes the following description of the mark: "The mark consists of the stylized letter 'M', in which the right side diagonal element is comprised of three curved flames, and the text 'MIRAGE BRANDS' where the 'BRANDS' text element is flanked on both sides with a filled-in circle element."

registered on the Principal Register in Registration No. 2546642 (the "'642 Registration") for "Cosmetics, namely, perfume, toilet water, aftershave, cologne, soaps, body creams and body lotions" in International Class 3,[3] as to be likely, when used in connection with the goods identified in the '192 and '885 Registrations, to cause confusion, to cause mistake, or to deceive.

The case is fully briefed.[4] We grant the Petition for Cancellation as to both registrations.

---

[3] The '642 Registration issued on March 12, 2002 and has been renewed.

[4] Citations in this opinion to the briefs and other docket entries refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear. Petitioner's main brief appears at 64 TTABVUE and his reply brief appears at 67 TTABVUE. Respondent's redacted brief appears at 65 TTABVUE.

## I.   Record

The record consists of the pleadings,[5] the file histories of the '192 and '885 Registrations, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1),[6] and the following materials submitted by the parties:

**Petitioner:**

- Petitioner's testimony declaration and Exhibits 1-10 thereto ("Sabhnani Decl."), 40 TTABVUE 2-120;[7]

- Petitioner's First Notice of Reliance and Exhibits 1A-1C thereto, consisting of electronic records of the United States Patent and Trademark Office ("USPTO") regarding Petitioner's '642 Registration, 34 TTABVUE 2-11;

- Petitioner's Second Notice of Reliance and Exhibit 2 thereto, consisting of USPTO electronic records regarding an Office Action during examination

---

[5] 1 TTABVUE (Petition for Cancellation); 10 TTABVUE (Answer to Petition for Cancellation). Respondent's Answer denied the material allegations in Petitioner's Petition for Cancellation and interposed five purported affirmative defenses. *Id.* at 7. Respondent's first affirmative defense of failure to state a claim upon which relief can be granted is not an affirmative defense. *U.S. Olympic Comm. v. Tempting Brands Neth. B.V.*, 2021 USPQ2d 164, at *4 (TTAB 2021). Respondent's second, third, and fifth affirmative defenses of laches, estoppel, and bad faith were not pursued by Respondent in its brief and were thus waived. *Ayoub, Inc. v. ACS Ayoub Carpet Serv., Inc.*, 118 USPQ2d 1392, 1394 n.4 (TTAB 2016). Respondent's fourth affirmative defense that the "Petition for Cancellation fails to demonstrate that any confusion has occurred or is likely to occur" is merely an amplification of Respondent's denial of a likelihood of confusion. Although it is permissible to amplify a denial of, for example, an allegation of a likelihood of confusion in a pleading, *see Morgan Creek Prods., Inc. v. Foria Int'l, Inc.*, 91 USPQ2d 1134, 1135-36 (TTAB 2009), such amplification is not, and should not be pled as, a separate "defense," and we do not treat it as such here.

[6] As discussed below, both parties unnecessarily submitted portions of the file histories of the '192 and '885 Registrations, which are automatically of record.

[7] We will cite the Sabhnani Declaration by paragraph and exhibit number (e.g., "Sabhnani Decl. ¶ 17; Ex. 1") in addition to TTABVUE pages. The paragraphs following paragraphs 1-47 in the Sabhnani Declaration are misnumbered 41-46. We will refer to those latter paragraphs 41-46 as the "Second Numbered" paragraphs.

of the application that matured into the '192 Registration, 35 TTABVUE 2-23;

- Petitioner's Third Notice of Reliance and Exhibit 3A-3B thereto, consisting of various USPTO electronic records regarding the '192 and '885 Registrations, 36 TTABVUE 2-12;

- Petitioner's Fourth Notice of Reliance and Exhibits 4A-4J thereto, consisting of excerpts from the discovery deposition of Respondent's President Dianne Hamerling, and various exhibits thereto ("Hamerling Tr."), 37 TTABVUE 2-198;[8]

- Petitioner's Fifth Notice of Reliance and Exhibits 5A-5C thereto, consisting of Internet webpages displaying perfumes offered at different prices, 38 TTABVUE 2-17; and

- Petitioner's Sixth Notice of Reliance and Exhibit 6 thereto, consisting of a dictionary definition of the word "mirage." 39 TTABVUE 2-11.

---

[8] Both depositions in this case were taken remotely due to the Covid-19 pandemic. We commend the parties and their counsel for their cooperation in conducting the depositions in this manner despite some technical difficulties. We will cite the Hamerling transcript by numbered pages and lines (e.g., "Hamerling Tr. 4:12-14") and exhibit numbers in addition to TTABVUE pages. The entire Hamerling transcript was designated "Confidential Attorneys Eyes Only" under the Board's Standard Protective Order, subject to subsequent re-designation by Respondent's counsel. Hamerling Tr. 82:16-83:10 (37 TTABVUE 79-80). Petitioner filed excerpts from the transcript in the publicly accessible TTABVUE file without objection from Respondent, so we will assume that Respondent re-designated at least the filed pages as non-confidential and we will disregard the original designation. In any event, pursuant to Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g), the Board will not treat as confidential any material that cannot reasonably be considered confidential, notwithstanding the confidential designation.

**Respondent:**

- Ms. Hamerling's Testimony Declaration and Schedules 1-4 thereto ("Hamerling Decl."), 57 TTABVUE 2-99;[9]

- Respondent's First Notice of Reliance and Exhibits 1A-1C thereto, consisting of USPTO electronic records regarding the '192 Registration, 45 TTABVUE 2-14;

- Respondent's Second Notice of Reliance and Exhibits 2A-2C thereto, consisting of USPTO electronic records regarding the '885 Registration, 46 TTABVUE 2-13;

- Respondent's Third Notice of Reliance and Exhibits 3A-3C thereto, consisting of USPTO electronic records regarding Petitioner's pleaded '642 Registration, 47 TTABVUE 2-13;

- Respondent's Fourth Notice of Reliance and Exhibits 4A-4B thereto, consisting of various advertisements circulated by Respondent, 48 TTABVUE 2-74;

- Respondent's Fifth Notice of Reliance and Exhibit 5A thereto, consisting of an Internet webpage displaying Respondent's perfumes, 49 TTABVUE 2-9;

- Respondent's Sixth Notice of Reliance and Exhibit 6A thereto, consisting of an Internet webpage displaying Respondent's perfumes, 50 TTABVUE 2-7;

---

[9] We will cite the Hamerling Declaration in the same manner as the Sabhnani Declaration. Portions of the Hamerling Declaration were designated "Confidential Attorneys Eyes Only" under the Board's Standard Protective Order and were redacted. The unredacted Hamerling Declaration was filed under seal at 58 TTABVUE.

- Respondent's Seventh Notice of Reliance and Exhibit 7A thereto, consisting of USPTO electronic records regarding Respondent's response to an Office Action during examination of the application that matured into the '192 Registration, 51 TTABVUE 2-12;

- Respondent's Eighth Notice of Reliance and Exhibits 8A-8H thereto, consisting of USPTO electronic records regarding third-party registrations of various MIRAGE-formative marks, 52 TTABVUE 2-33;

- Respondent's Ninth Notice of Reliance and Exhibits 9A-9B thereto, consisting of Internet webpages displaying perfumes offered under one of the registered third-party MIRAGE-formative marks, 53 TTABVUE 2-15;

- Respondent's Tenth Notice of Reliance and Exhibit 10A thereto, consisting of a dictionary definition of the word "royal," 54 TTABVUE 2-10;

- Respondent's Eleventh Notice of Reliance and Exhibits 11-A-11I thereto, consisting of excerpts from the discovery deposition of Petitioner and certain exhibits thereto ("Sabhnani Tr."), 55 TTABVUE 2-175;[10]

- Respondent's Twelfth Notice of Reliance and Exhibits 12A-12B thereto, consisting of Respondent's First Set of Requests for Admission with proof of service, and a statement of Respondent's counsel that no responses were received from Petitioner, 56 TTABVUE 2-15; and

---

[10] We will cite Petitioner's deposition transcript in the same manner as the Hamerling deposition transcript.

- Respondent's Amended Twelfth Notice of Reliance and Exhibits 12A-12B thereto, consisting of Respondent's First Set of Requests for Admission and the parties' stipulation deeming Request Nos. 2, 4-6, 11-12, 14, 20, 25, 29-33, 35-37, and 39-42 to be admitted by Petitioner. 62 TTABVUE 2-16.[11]

## II.    Evidentiary Issues

In its brief, Respondent asserts five sets of objections to Petitioner's evidence, including objections to various statements in the Sabhnani Declaration. 65 TTABVUE 13-15, 35-37. Petitioner responds to the objections to his Declaration in Appendix A to his reply brief. 67 TTABVUE 14-16.

Respondent first objects to Petitioner's "depiction of its design mark 'ROYAL MIRAGE' in Petitioner's Main Brief" without a double-lined perimeter as shown in the '642 Registration, claiming that Petitioner's "use of the design mark in its [sic] brief does not show the mark as registered and submitted in evidence." 65 TTABVUE 13 (citing 64 TTABVUE 7-8, 11). This is not an evidentiary objection per se, but we agree with Respondent that we must consider the entirety of Petitioner's mark as shown in the '642 Registration because Petitioner did not plead common law use of only the literal and internal design elements of the registered mark.

Respondent's second objection is that Petitioner incorrectly stated in his brief that both of the applications that matured into the '192 and '885 Registrations were

---

[11] Petitioner moved during trial to withdraw his deemed admissions of Respondent's requests. 59 TTABVUE 2-303. The parties reached an agreement to resolve the motion, 60 TTABVUE, and filed a stipulation withdrawing the motion and agreeing that certain of Respondent's requests would be deemed admitted. 61 TTABVUE 2-3.

initially refused registration during prosecution on the basis of Petitioner's '642 Registration. *Id.* at 14 (citing 64 TTABVUE 10). This, too, is not an evidentiary objection per se, but the record shows that only the standard-character mark application was initially refused registration.

Respondent's third objection is to one of the third-party uses made of record by Petitioner, "specifically Creed Aventus," because "the evidence is related to goods made from alternative ingredients through Creed's unique infusion process . . . in a way that is more expensive which accounts for the larger price tag." *Id.* According to Respondent, "that fragrance cannot be compared to the fragrance products sold by Petitioner and/or Respondent." *Id.* (citing 38 TTABVUE 5). We need not rule on this objection to the extent that it is based on relevance under Rule 402 of the Federal Rules of Evidence because "the Board is capable of weighing the relevance and strength or weakness of the objected to testimony and evidence, including any inherent limitations." *RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1804 (TTAB 2018), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019).

Respondent's fourth objection is a relevance objection under Rule 402 of the Federal Rules of Evidence to the international trademark registrations attached as Exhibits 1 and 2 to the Sabhnani Declaration. 65 TTABVUE 14-15. We **sustain** this objection because Petitioner's foreign registrations are "immaterial to [his] right to register the mark in the United States," or to challenge Respondent's registrations of its marks. *Bureau National Interprofessionnel Du Cognac v. Int'l Better Drinks Corp.*,

6 USPQ2d 1610, 1618 (TTAB 1988). We have given no consideration in our decision to Petitioner's foreign registrations or his accompanying testimony regarding them.

Respondent's fifth set of objections are to various portions of the Sabhnani Declaration. 65 TTABVUE 35-37. The objections fall into four general categories, with some overlap: (1) relevance under Rule 402 of the Federal Rules of Evidence (Sabhnani Decl. ¶¶ 41-47; Exs. 1-2, 8-10 (40 TTABVUE 15-18, 21-57, 114-19)); (2) speculation, lack of foundation, and (apparently) lack of personal knowledge under Rule 602 of the Federal Rules of Evidence (Sabhnani Decl. ¶ 3, Second Numbered ¶¶ 41-42 (40 TTABVUE 3-4, 18-19)); (3) hearsay under Rules 801 and 802 of the Federal Rules of Evidence (Sabhnani Decl. ¶ 30, Second Numbered ¶ 45; Ex. 5 (40 TTABVUE 11, 19, 94-97));[12] and (4) lack of a URL and a capture date for certain Internet evidence under *Safer, Inc. v. OMS Invs., Inc.*, 94 USPQ2d 1031 (TTAB 2010) (Sabhnani Decl. ¶ 24; Ex. 3 (40 TTABVUE 10, 58-86)).

Except with respect to the relevance objection to Petitioner's foreign registrations, which we have sustained above, we need not rule on Respondent's relevance objections to Sabhnani Decl. ¶¶ 41-47; Exs. 8-10 (40 TTABVUE 15-18, 114-19),[13] and

---

[12] Respondent also argues that Mr. Sabhnani's testimony in second numbered ¶ 45 (40 TTABVUE 19) is "[c]ontradicted by [his] detailed deposition testimony." 65 TTABVUE 37. We will consider whether Petitioner was impeached by his prior deposition testimony in assessing the probative value and credibility of his declaration testimony.

[13] Respondent objects to Exhibit 8 to the Sabhnani Declaration, 65 TTABVUE 36, which Petitioner described as "an advertisement for Royal Mirage branded products." Sabhnani Decl. ¶ 41; Ex. 8 (40 TTABVUE 15, 115). The advertisement states that the goods are "Available in all GCC Countries and India." Respondent argues that "Exhibit 8 shows the product was **only** available outside the United States, *i.e.*, in India and the 'GCC Countries' (the Gulf Cooperation countries: Bahrain, Kuwait, Oman, Qatar, Saudi Arabia, and the United Arab Emirates.)." 65 TTABVUE 36 (emphasis added). We disagree with Respondent's

we will consider the objected-to testimonial and documentary evidence for whatever probative value it may have, taking into account "any inherent limitations" in the evidence. *RxD Media*, 125 USPQ2d at 1804.

Respondent's objections based on speculation, lack of foundation, and lack of personal knowledge under Rule 602 of the Federal Rules of Evidence are directed to Petitioner's testimony that he "commenced this cancellation proceeding because the Registrant's MIRAGE BRANDS Marks are confusingly similar to the ROYAL MIRAGE mark and the purchasing public is undoubtedly assuming that its goods originate from the same source as, or are associated with, each other," Sabhnani Decl. ¶ 3 (40 TTABVUE 3-4), and Petitioner's "evidence which recited Petitioner's opinion of fragrance product pricing and consumer purchasing practices." 65 TTABVUE 36 (citing Sabhnani Decl. Second Numbered ¶¶ 41-42 (40 TTABVUE 18-19)).

Rule 602 of the Federal Rules of Evidence provides that a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," and that "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Fed. R. Evid. 602. Petitioner testified that his Declaration was "based on [his] own personal knowledge and on the records maintained by [him] in the ordinary course of business," Sabhnani Decl. ¶ 1 (40 TTABVUE 2-3), that he has been involved in the fragrance business since 1980, Sabhnani Decl. ¶ 2 (40 TTABVUE 3), and that his company has been selling

characterization of this exhibit because the advertisement is entirely in English and provides an address in New York, but the advertisement is not material to our decision in any event.

fragrances in the United States since 1980. Sabhnani Decl. ¶ 2 (40 TTABVUE 3). We find that this foundational testimony is sufficient to establish that Petitioner has personal knowledge of the fragrance industry in the United States. We therefore **overrule** Respondent's objection to the extent that we have considered his testimony regarding perfume pricing for whatever probative value it may have. We **sustain** Respondent's objection to the extent that it is directed to Petitioner's opinions as to the likelihood of confusion between the parties' marks and the existence of confusion among perfume purchasers. Sabhnani Decl. ¶ 3 (40 TTABVUE 3-4). *See, e.g.*, *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399, 1402 (TTAB 2010) ("[T]he Board is responsible for determining whether the marks are similar, and we will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts.").

We **overrule** Respondent's two hearsay objections. The hearsay objection to Exhibit 5, a review page "submitted by a U.S. customer to Amazon.com in 2017," Sabhnani Decl. ¶ 30; Ex. 5 (40 TTABVUE 11, 95-97), is not well-taken because Petitioner offers these pages to corroborate his testimony that "[s]ales of Royal Mirage branded products have been ongoing on the Amazon Marketplace since long before [Respondent's] registration of its mark." Sabhnani Decl. ¶ 30 (40 TTABVUE 11). Petitioner does not rely on the review for the truth of what is stated in it.

The hearsay objection to Petitioner testimony regarding telephone calls that he has received is also not well-taken because

> [t]hese misdirected telephone calls are admissible under
> the hearsay exceptions set forth under Fed. R. Evid. 803(1)

> (present sense impression), as evidence of what [Petitioner] heard and experienced during the conferences, or under Fed. R. Evid. 803(3) (state of mind), as statements revealing the declarant's state of mind. The statements are not offered for the truth of the statements but rather simply for the fact that they were made.

*Edom Labs., Inc. v. Lichter*, 102 USPQ2d 1546, 1552 (TTAB 2012). *See also Anthony's Pizza & Pasta Int'l, Inc. v. Anthony's Pizza Holding Co.,* 95 USPQ2d 1271, 1273 (TTAB 2009), *aff'd,* 415 F. App'x. 222 (Fed. Cir. 2010). We have considered Petitioner's testimony regarding the calls for whatever probative value it may have.

Finally, we **overrule** Respondent's objections to the lack of foundation for Petitioner's Internet materials in Exhibit 3 to the Sabhnani Declaration because Respondent's objection is a procedural one that was waived when Respondent did not timely move to strike the pertinent portion of the Sabhnani Declaration following its receipt. *Moke Am. LLC v. Moke USA LLC*, 2020 USPQ2d 10400, at \*5-6 (TTAB 2020), *civil action filed*, No. 3:20-cv-00400-DJN-EWH (E.D. Va. June 5, 2020). We have considered Exhibit 3 and Petitioner's accompanying testimony for whatever probative value they may have.

## III.    Entitlement to a Statutory Cause of Action[14]

A plaintiff's entitlement to invoke a statutory cause of action for opposition or cancellation is a necessary element in every inter partes case even if, as here, the

---

[14] Board decisions have previously analyzed the requirements of Sections 13 and 14 of the Trademark Act under the rubric of "standing," and the parties here have done so as well. 64 TTABVUE 14 (arguing that Petitioner "has Standing to Seek to Cancel the MIRAGE BRANDS Marks' Registrations."); 65 TTABVUE 15 (stating that Respondent does not contest that Petitioner "has standing in this matter."). "We now refer to what previously had been called standing as 'entitlement to a statutory cause of action.' But our prior decisions and those of the Federal Circuit interpreting 'standing' under §§ 13 and 14 remain applicable."

defendant does not contest the plaintiff's entitlement. *Chutter*, 2021 USPQ2d 1001, at *10 (citing *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, ___ U.S. ___ (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, ___ U.S. ___ (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067 n.4 (2014)). As the party in the position of plaintiff, Petitioner may seek to cancel Respondent's registrations if such a claim is within the zone of interests protected by the statute, 15 U.S.C. § 1064, and Petitioner has a reasonable belief in damage that is proximately caused by the continued registration of Respondent's marks. *Chutter*, 2021 USPQ2d 1001, at *10 (citing *Spanishtown Enters.*, 2020 USPQ2d 11388, at *1).

Petitioner has shown his entitlement to seek to cancel Respondent's registrations because he has properly made of record USPTO electronic records showing his ownership of the valid and subsisting '642 Registration of a mark containing the words ROYAL MIRAGE for perfume and cologne. This gives Petitioner both an interest falling within the zone of interests protected by 15 U.S.C. § 1064 and a reasonable belief in damage that is proximately caused by the continued registration of Respondent's marks. *See, e.g.*, *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

---

*Chutter, Inc. v. Great Mgmt. Grp., LLC,* 2021 USPQ2d 1001, at *10 n.39 (TTAB 2021) (citing *Spanishtown Enters., Inc. v. Transcend Res., Inc.*, 2020 USPQ2d 11388, at *2 (TTAB 2020)).

## IV.   Analysis of Section 2(d) Claim

Section 2(d) of the Trademark Act prohibits the registration of a mark that "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d).

### A.   Priority

"In a cancellation proceeding such as this one where both parties own registrations, priority is in issue." *Double Coin Holdings Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, at *4 (TTAB 2019) (quoting *Couch/Braunsdorf Affinity, Inc. v. N. Atl. Operating Co.*, 110 USPQ2d 1458, 1474 (TTAB 2014)). Petitioner must prove that he has a proprietary "interest in [his] mark . . . and that interest was obtained prior to either the filing date[s] of [Respondent's] [underlying] application[s] for registration or [its] date[s] of first use." *Id.*, at *4-5 (quoting *Top Tobacco LP v. N. Atl. Operating Co.*, 101 USPQ2d 1163, 1169 (TTAB 2011)).

The applications that matured into Respondent's '192 and '885 Registrations were both filed on November 30, 2016, and Ms. Hamerling testified that Respondent began use of its marks "on or around December 21, 2016." Hamerling Decl. ¶ 4. Petitioner thus must show that he began use of his registered mark before Respondent's constructive use date of November 30, 2016, which is the earliest date on which Respondent may rely. *Double Coin Holdings*, 2019 USPQ2d 377409, at *4. Petitioner

may rely on the October 27, 2000 filing date of the application that matured into his '642 Registration, 34 TTABVUE 5, which is long prior to Respondent's November 30, 2016 constructive use priority date. *Double Coin Holdings*, 2019 USPQ2d 377409, at *5. Petitioner thus "has established [his] priority in this proceeding." *Id.*

### B. Likelihood of Confusion

Our determination of the likelihood of confusion under Section 2(d) of the Trademark Act is based on an analysis of all probative facts in the record that are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*"). We consider each *DuPont* factor for which there is evidence and argument. *See, e.g., In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). In every case under Section 2(d), "two key considerations are the similarities between the marks and the similarities between the goods." *Double Coin Holdings*, 2019 USPQ2d 377409, at *5 (citing *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.")). Petitioner "bears the burden of proving a likelihood of confusion by a preponderance of the evidence." *Id.*

Both parties address the first of the two key *DuPont* factors (the similarity or dissimilarity of the marks and goods),[15] as well as the third factor (the "similarity or

---

[15] Petitioner also addresses the second factor, but Respondent "does not contest that the category of goods involved in this proceeding are [sic] the same, i.e., fragrance products . . . ." 65 TTABVUE 15.

dissimilarity of established, likely-to-continue trade channels"); the fourth factor (the "conditions under which and buyers to whom sales are made, i.e. 'impulse' vs. careful, sophisticated purchasing"); the sixth factor (the "number and nature of similar marks in use on similar goods"); and the seventh and eighth factors (the "nature and extent of any actual confusion" and the "length of time during and conditions under which there has been concurrent use without evidence of actual confusion"). *DuPont*, 177 USPQ at 567. 64 TTABVUE 18-31; 65 TTABVUE 16-31.

"[T]he weighing of the relevant [*DuPont*] factors must take into account the confusion that may flow from extensive promotion of a similar or identical mark by a junior user." *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993). The term "reverse confusion" has been used to "describe the situation where a significantly larger or more prominent newcomer 'saturates the market' with a trademark that is confusingly similar to that of a smaller, senior registrant for related goods or services." *Id.* (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 24 USPQ2d 1001, 1010 & n.12 (7th Cir. 1992)).[16] In a reverse confusion scenario, the "junior user does not seek to benefit from the goodwill of the senior user; however, the senior user may experience diminution or even loss of its mark's identity and goodwill due to extensive use of a confusingly similar mark by the junior user."

---

[16] Petitioner did not specifically plead reverse confusion, but it "'does not have to be specifically pleaded so long as the plaintiff asserts that the respective marks are so similar as applied to the respective goods or services as to be likely to cause confusion.'" *Top Tobacco*, 101 USPQ2d at 1175 n.18 (quoting *Am. Hygienic Labs. v. Tiffany & Co.*, 12 USPQ2d 1979, 1983 n.7 (TTAB 1989)). Petitioner alleged such a likelihood of confusion and we are obligated to consider confusion in whatever manner it presents itself under Trademark Act Section 2(d).

*Top Tobacco*, 101 USPQ2d at 1175 (quoting *Shell Oil*, 26 USPQ2d at 1690). As the Federal Circuit explained in *Shell Oil*, a "newcomer does not gain the right to register a substantially identical mark simply because the number of persons exposed to the registrant's mark may be small in relation to the newcomer's volume of use." *Shell Oil*, 26 USPQ2d at 1690. Despite its smaller market share, a "registrant/senior user is safeguarded by the trademark law, as is the consuming public, from likelihood of confusion caused by the entry of a junior user of a confusingly similar mark." *Id.* (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 331 (1985)).

The factual record in this case presents circumstances suggesting the presence of reverse confusion. Respondent describes itself as "a major seller of fragrance brands in the United States," 65 TTABVUE 8, and claims that it "has made extensive sales of its branded fragrance products in the United States from approximately August 1, 2017 through July 21, 2020," *id.* at 24, "in stark contrast to [Petitioner] and [his] *de minimis* sale and distribution of [his] fragrance products in the United States." *Id.* at 25. Respondent's sales figures were designated "Confidential Attorneys' Eyes Only" and were included in the unredacted version of the Hamerling Declaration filed under seal. We have reviewed those figures and find them to be quite substantial—multiple orders of magnitude larger than Petitioner's sales figures for the same period. As the Federal Circuit noted in *Shell Oil*, these facts suggest that it is far more likely that consumers will be exposed to Respondent's marks than to Petitioner's mark.

### 1. Similarity or Dissimilarity of the Goods, Channels of Trade, and Buyers to Whom Sales Are Made

We begin with the second and third *DuPont* factors, which respectively consider "'[t]he similarity or dissimilarity and nature of the goods or services as described in an application or registration,'" and "'the similarity or dissimilarity of established, likely-to-continue trade channels.'" *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1051-52 (Fed. Cir. 2018) (quoting *DuPont*, 177 USPQ at 567). We also discuss the portion of the fourth *DuPont* factor that addresses the "buyers to whom sales are made." *DuPont*, 177 USPQ at 567.

### a. Similarity or Dissimilarity of the Goods

"In making our determination regarding the relatedness of the goods, we must look to the goods as identified in the parties' registrations." *Double Coin Holdings*, 2019 USPQ2d 377409, at *5 (citing *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014)). Each of the parties' registrations covers "perfume" and "cologne," either in the singular ('642 Registration) or in the plural ('192 and '885 Registrations).[17] The goods are thus identical in part, such that the second *DuPont* factor strongly supports a finding of a likelihood of confusion as to both of Respondent's registrations.

---

[17] To prevail as to the entire class in each registration, Petitioner need not show that there is a likelihood of confusion as to both "perfumes" and "colognes" because likelihood of confusion must be found as to the entire class if it exists as to either good. *Double Coin Holdings*, 2019 USPQ2d 377409, at *6 (citing *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981)). We will focus on the goods identified as "perfumes."

### b. Similarity or Dissimilarity of the Channels of Trade and the Buyers to Whom Sales Are Made

Respondent devotes considerable briefing and evidence to the third *DuPont* factor, arguing that Respondent "is a wholesaler that sells its fragrance products to distributers [sic], chain retailers and large volume distributors in the United States at a very low price point," 65 TTABVUE 23, that Petitioner's "fragrance products are not available for sale in any of the retail stores where Mirage Brand products are available for sale," *id.*, and that "[d]ue to the different channels of trade, the use of the marks and the price differential, this *du Pont* factor weighs in favor of" Respondent. *Id.* at 27. But as with the relatedness of the goods, the similarity or dissimilarity of the channels of trade must be determined based on the identifications of goods in the parties' registrations rather than current real-world conditions.

The "identical goods in the parties' registrations are construed to include all goods of the type identified and '[i]t is well established that absent restrictions in the . . . registration[s], [identical] goods . . . are presumed to travel in the same channels of trade to the same classes of purchasers.'" *Double Coin Holdings*, 2019 USPQ2d 377409, at *5 (quoting *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018)). *See also Stone Lion*, 110 USPQ2d at 1162 (holding that it was proper for the Board "to focus on the [involved] application and registrations rather than real-world conditions . . . regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed."); *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) ("[A]bsent restrictions in the

application and registration, [identical] goods and services are presumed to travel in the same channels of trade to the same class of purchasers."). We must therefore presume that the goods identified in the parties' registrations as "perfumes" travel "in the same channels of trade to the same classes of purchasers." *Double Coin Holdings*, 2019 USPQ2d 377409, at *5.[18]

The third *DuPont* factor and the portion of the fourth *DuPont* factor regarding the buyers to whom sales are made thus also strongly support a finding of a likelihood of confusion as to both of Respondent's registrations.

### 2. The Number and Nature of Similar Marks in Use on Similar Goods

We turn next to the sixth *DuPont* factor, which "considers '[t]he number and nature of similar marks in use on similar goods.'" *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1693 (Fed. Cir. 2018) (quoting *DuPont*, 177 USPQ at 567). "[E]vidence of the extensive registration and use of a term by others can be powerful evidence of the term's weakness." *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1057 (TTAB 2017) (citing *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015)).

---

[18] As the Federal Circuit explained in *Stone Lion*, the goods "recited in the application determine the post-grant benefit of registration." *Stone Lion*, 110 USPQ2d at 1162. Respondent sought and obtained registrations for goods broadly identified as "perfumes" and is accordingly granted the exclusive right to use its mark "in connection with the goods . . . specified in the registration[s]." 15 U.S.C. § 1115(a). "Parties that choose to recite [goods] in their trademark application[s] that exceed their actual [goods] will be held to the broader scope of the application[s]." *Stone Lion*, 110 USPQ2d at 1163.

"The purpose of introducing evidence of third-party use is 'to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different [such] marks on the bases of minute distinctions.'" *Omaha Steaks*, 128 USPQ2d at 1693 (quoting *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005)). Third-party uses may bear on the commercial weakness of a mark, *Tao Licensing*, 125 USPQ2d at 1057, and may be "relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Omaha Steaks*, 128 USPQ2d at 1693 (quoting *Palm Bay Imps.*, 73 USPQ2d at 1694). Third-party registrations "may bear on conceptual weakness if a term is commonly registered for similar goods or services." *Tao Licensing*, 125 USPQ2d at 1057; *see also In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010); *Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 189 USPQ 693, 694-95 (CCPA 1976). Respondent offers one third-party use and eight third-party registrations.

Respondent argues that Petitioner's mark is weak and entitled only to a narrow scope of protection "because the term 'MIRAGE' is common due to widespread third-party use in connection with goods in Class 003." 65 TTABVUE 31. According to Respondent, the "USPTO has registered numerous marks over the years that include the term 'MIRAGE' in connection with goods in Class 003 and related classes," *id.*, including HOLLISTER JASMINE MIRAGE (JASMINE disclaimed) for "perfumes" and other goods, 52 TTABVUE 6-7; DESERT MIRAGE for "fragrances for personal use," *id.* at 10-11; GOLD MIRAGE (GOLD disclaimed) for "cosmetics," *id.* at 13-15;

SHINE MIRAGE (SHINE disclaimed) for "cosmetics," *id.* at 17-19; RADIANT MIRAGE for "fragrances for personal use" and other goods, *id.* at 21-22; MIRAGE WATERLESS (WATERLESS disclaimed) for various hair care products, *id.* at 24-25; TRUE MIRAGE SKIN CARE and design (SKIN CARE disclaimed) for "non-medicated skin serum," *id.* at 28-29; and MIRAGE LAYON and design for "extracts of flowers being perfumes" and other goods. *Id.* at 31-32. Respondent also made of record evidence of use of the registered DESERT MIRAGE mark for perfumes. 53 TTABVUE 5-14; Hamerling Decl. ¶¶ 78-79 (57 TTABVUE 19).

Petitioner argues that Respondent's "registrations do not affect the likelihood of confusion analysis," 64 TTABVUE 28, because the registrations were all issued during the pendency of this proceeding, before he had the opportunity to investigate and challenge them, there is no evidence that the third-party use competes with his products, and he is not required to challenge more than one possible infringer at a time. *Id.* at 28-30. In his reply brief, Petitioner argues that "it is the Respondent's own registration several years ago that has opened the door to the fashionable infringement of the Petitioner's trademark rights," and that "Respondent has failed to meet its burden to establish that most of these new registrations are *actually* in use in the market." 67 TTABVUE 12.

We turn first to Respondent's third-party use evidence, which is the only evidence relevant to the commercial weakness of Petitioner's mark. *See Tao Licensing*, 125 USPQ2d at 1059 ("[a]s to commercial weakness, '[t]he probative value of third-party trademarks depends entirely upon their usage'") (quoting *Palm Bay Imps.*, 73

USPQ2d at 1693)). Respondent offers evidence of the use of only one third-party mark (DESERT MIRAGE) for perfumes and "did not show how long or how extensively" this mark has been used. *Id.* at 1058. A single third-party use of a MIRAGE-formative mark for perfume is insufficient to show the commercial weakness of Petitioner's MIRAGE-formative composite mark. *Id.* at 1059 (finding that numerous third-party uses of TAO-formative marks without evidence of "the current nature and extent of use of the third-party marks" did not permit Board to "infer such a degree of recent consumer exposure as would show that consumers generally distinguish among the marks containing 'tao' based on minor distinctions.").

Turning next to Respondent's third-party registration evidence, which goes only to the conceptual weakness of Petitioner's mark, only six of the eight registrations cover "perfumes" or "colognes," the goods identified in both parties' registrations, either explicitly (HOLLISTER JASMINE MIRAGE for "perfumes" and MIRAGE LAYON and design for "extracts of flowers being perfumes"), or because the pertinent goods identifications encompass perfume (DESERT MIRAGE and RADIANT MIRAGE for "fragrances for personal use" and GOLD MIRAGE and SHINE MIRAGE for "cosmetics").[19] The other registrations cover hair care products (MIRAGE WATERLESS) and "non-medicated skin serum" (TRUE MIRAGE SKIN CARE and design).

---

[19] As noted above, the identification of goods in Petitioner's '642 Registration lists "perfume" as a type of "cosmetics."

Respondent simply assumes that hair care products and skin serum are "related goods" to perfumes, 65 TTABVUE 32, without any supporting argument, much less evidence. The two registrations of MIRAGE-formative marks for goods other than perfume have little or no probative value in showing the conceptual weakness of the word MIRAGE in Petitioner's mark. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1751 (Fed. Cir. 2017) (disregarding third-party registrations for other types of goods where the proffering party had neither proven nor explained that they were related to the goods in the cited registration); *In re Inn at St. John's*, 126 USPQ2d 1742, 1745 (TTAB 2018), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019); *cf. Omaha Steaks*, 128 USPQ2d at 1695 (where the parties' goods were identical meat products, third-party uses on other food products were "properly understood as having no real probative value for the analysis at hand.").

In addition, while the registered marks all contain the word "MIRAGE," they contain additional elements that cause many of them to be less similar to Petitioner's mark than Respondent's marks are. *Cf. Inn at St. John's*, 126 USPQ2d at 1745-46 (discounting probative value of third-party registrations "contain[ing] the non-identical term 'Fifth'" in showing that the cited registered mark 5IVESTEAK was weak).

Respondent's evidence consists of one third-party use and six third-party registrations "of varying probative value." *Id.* "This is a far cry from the large quantum of evidence of third-party use and third-party registrations that was held to

be significant in both" *Jack Wolfskin* and *Juice Generation*. *Id.*[20] We find that the sixth *DuPont* factor is neutral in our analysis of the likelihood of confusion, and we therefore accord Petitioner's mark "the normal scope of protection to which inherently distinctive marks are entitled." *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1347 (TTAB 2017).

### 3. Similarity or Dissimilarity of the Marks

Under the first *DuPont* factor, we consider "the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps.*, 73 USPQ2d at 1691. "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *Inn at St. John's*, 126 USPQ2d at 1746 (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)).

The proper test regarding similarity "is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai*, 127 USPQ2d at 1801 (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (internal quotation marks and citation omitted)). "The proper perspective on which the analysis must focus is on the recollection of the average customer, who retains a general rather than specific impression of marks." *In re i.am.symbolic, llc*, 127 USPQ2d 1627, 1630 (TTAB 2018) (citations omitted). The

---

[20] "[I]n *Juice Generation*, there were at least twenty-six relevant third-party uses or registrations of record . . . and in *Jack Wolfskin*, there were at least fourteen . . . ." *In re Morinaga Nyugyo K.K.*, 120 USPQ2d 1738, 1746 n.8 (TTAB 2016).

average customers here are purchasers of perfumes and colognes. Because the identifications of goods in the parties' registrations do not include any restrictions or limitations regarding channels of trade, classes of consumers, or prices, these purchasers of perfumes and colognes are ordinary consumers.

Because the identified goods are identical in part, a lesser degree of similarity between the marks is required for confusion to be likely. *Coach Servs.*, 101 USPQ2d at 1721; *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *14 (TTAB 2020).

Petitioner's arguments are all directed to Respondent's composite word-and-design mark. He acknowledges that "there are slight discernable differences in the marks under review, but none likely to prevent the persistence of consumer confusion." 64 TTABVUE 18. Petitioner defines and displays what he calls the "most distinctive aspects of the MIRAGE BRANDS design mark on the one hand [and] the ROYAL MIRAGE Mark on the other" as follows:



*Id.* As noted above, we agree with Respondent that Petitioner's registered mark is not simply the words and design shown by Petitioner, but rather consists of the entire mark shown in the '642 Registration, including the apparent outline of a package.[21]

Petitioner argues that "the appearance of the word 'Mirage' in relation to a $3-$5 per ounce fragrance is the most dominant aspect of both marks and the word most likely to stick out in the mind of an average consumer." *Id.* at 21. According to Petitioner, the marks are "strikingly similar to the eye" because "[b]oth stylized design marks prominently feature the word MIRAGE in capital letters in a similar font directly below a multi-pronged graphic icon – upward pointing flames for Mirage Brands and a pointed crown for Royal Mirage – as a way to identify the source of the fragrances." *Id.* at 18-19.[22]

With respect to meaning, Petitioner argues that the word "mirage" common to the marks is arbitrary with respect to perfumes, *id.* at 19-20, that the "addition of the word 'Brands' and the word 'Royal' in the two marks does not distinguish them sufficiently to avoid a likelihood of confusion," *id.* at 20, and that "the addition of the word '*Brands*' only serves to *increase* the likelihood of confusion." *Id.*

---

[21] In his reply brief, Petitioner discusses and displays his entire mark, 67 TTABVUE 4-6, and argues that the "dominant and most commercially relevant aspect of the ROYAL MIRAGE Mark is the phrase 'Royal Mirage' and the multi-pointed crown" because the "'distinctive double-walled border'—as the Respondent describes it—is a box-design element that a buyer is far less likely to rely on and recall as a source designation." *Id.* at 5-6.

[22] Petitioner and Respondent each discuss the placement of their respective marks on the packaging for their goods. 64 TTABVUE 19; 65 TTABVUE 18, 23. Their discussion misses the mark because "we do not consider how [the parties] actually use their marks in the marketplace, but rather how they appear in the registration[s]. We must compare the marks as they appear in the drawings, and not on any [packaging] that may have additional wording or information." *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1186 (TTAB 2018).

Respondent argues that "the significant dissimilarities between the Mirage Brands Marks and the Royal Mirage Design Mark are sufficient to preclude any likelihood of confusion . . . ." 65 TTABVUE 16. With respect to its composite mark, Respondent argues that the "presence of just one common word between the Petitioner's design mark and [Respondent's] design and word mark does not override the striking overall dissimilarity between the marks." *Id.* at 18. Respondent appears to argue that Petitioner's mark is dominated by both the crown design and the word ROYAL, as Respondent claims that "the design elements of the Mirage Brands Design Mark and the Royal Mirage Design Mark predominate and are completely dissimilar when viewed objectively," *id.* at 18, and that "Petitioner's Royal Mirage Design Mark contains a dominant additional word, 'ROYAL,' having a stylized font, which is thematically tied to and reinforces the stylized crown element." *Id.*

Respondent further argues that "the design elements can be seen long before the customer approaches and views the wording," and that "[b]ecause of this emphasis, customers for Petitioner's products focus on the design element and the 'royal crown' theme." *Id.* Respondent contends that in its mark, "the large, stylized letter 'M', in which the right side diagonal element is comprised of three curved flames," "sits over and dominates the entire mark, and the text 'MIRAGE BRANDS' where the 'BRANDS' text element is flanked on both sides with a filled-in circle element." *Id.* at 18-19.

With respect to meaning, Respondent argues that the "commercial impression and connotation of Registrant's Mirage Brands Design Mark and Petitioner's Royal

Mirage Design Mark are vastly different when viewed from a reasonable consumer's perspective." *Id.* at 20. Respondent claims that "the 'ROYAL' component of Petitioner's Royal Mirage Design Mark will be given primary attention by consumers, especially since it synchronizes with the crown graphic of the design mark and the additional crown element on the top of Petitioner's fragrance product packaging," *id.*,[23] and that "the mere presence of a secondary word, Mirage, in Petitioner's Royal Mirage Design Mark is not likely to cause confusion with the commercial impression of [Respondent's] Mirage Brands Design Mark." *Id.* at 20-21.

With respect to its standard character mark, Respondent argues that the word ROYAL dominates Petitioner's mark, *id.* at 21, and that "when Petitioner's design mark is viewed by consumers, they will associate the term ROYAL with the crown giving an overall royal crown theme – a them[e] absent from [Respondent's] mark." *Id.* at 22. Respondent concludes that "the first *du Pont* factor alone is sufficient to show there is no likelihood of confusion between the Mirage Brands Word Mark and the Royal Mirage Design Mark, and this Cancellation proceeding should be decided in favor of [Respondent]." *Id.* at 23.

While the marks must be considered in their entireties, "'in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the

---

[23] As noted above, we cannot consider the use of the parties' marks on their actual packaging in assessing the similarity of the marks.

marks in their entireties.'" *Detroit Athletic Co.*, 128 USPQ2d at 1050 (quoting *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985)). As discussed above, the parties disagree as to the dominant portions of the respective marks, so we address that issue before turning to a comparison of the marks.

### a. The Dominant Portions of the Marks

Petitioner's composite word-and-design mark is displayed again below:



In marks "consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater impression upon purchasers, to be remembered by them, and to be used by them to request the goods." *Aquitaine Wine USA*, 126 USPQ2d at 1184 (citing *Viterra*, 101 USPQ2d at 1908; *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir. 1983)). "The verbal portion of a word and design mark 'likely will appear alone when used in text and will be spoken when requested by consumers.'" *Id.* (quoting *Viterra*, 101 USPQ2d at 1911); *see also Jack Wolfskin,* 116 USPQ2d at 1134 ("We have also explained that when a mark consists

of both words and a design, 'the verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed.'") (citation omitted).

We find, in the absence of any evidence to the contrary, that this general principle applies to Petitioner's composite mark. The rectangular exterior shape outlined in the mark appears to be commonly used in the perfume industry, including by Respondent itself, Hamerling Decl. ¶¶ 23-24; Schs. 1-2 (57 TTABVUE 8, 21-36, 50-65), and it is nothing more than a non-descript "carrier" for the words and design. *In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1534 (Fed. Cir. 1997) (finding that the word DELTA was the dominant portion of applicant's mark THE DELTA CAFE and design in part because "the design is an ordinary geometric shapes that serves as a background for the word mark."); *cf. In re Ocean Tech., Inc.*, 2019 USPQ2d 450686, at *5 (TTAB 2019) (circular design around wording in proposed mark found to be "a common geometric shape that consumers likely would perceive as a background design or carrier to the enclosed wording, rather than as a separable design element with trademark significance."). As between the words ROYAL MIRAGE and the crown design, the words are more "likely to make a greater impression upon purchasers, to be remembered by them, and to be used by them to request the goods," *Aquitaine Wine USA*, 126 USPQ2d at 1184, particularly because the crown design merely reinforces the words. We find that the words ROYAL MIRAGE are the dominant portion of Petitioner's mark. As discussed below, the word MIRAGE may have more source-identifying significance due to the laudatory nature of ROYAL, and we keep this in mind in our consideration of the marks.

Respondent's word mark is MIRAGE BRANDS in standard characters, with BRANDS disclaimed.[24] The mark is dominated by the word MIRAGE, which is the first word in the mark and the only one with source-identifying significance. *See, e.g.*, *In re Integrated Embedded*, 120 USPQ2d 1504, 1513 (TTAB 2016) (mark BARR GROUP dominated by the word BARR because of "its location as the first word in the mark" and because GROUP is "nondistinctive" and "disclaimed and descriptive of Applicant's services").

Respondent's composite word-and-design mark is displayed again below:



Like its word mark, Respondent's composite mark is dominated by the word MIRAGE, which is "[d]isplayed in a large, bold typeface" and "comprises the largest [full word in] the mark in terms of size, position, and emphasis." *Id.* at 1184-85. As in Respondent's word mark, the word BRANDS has no source-identifying significance and has been disclaimed. We find that in the context of the composite mark as a whole, the stylized letter "M" above the word MIRAGE serves primarily to reinforce the first letter in MIRAGE, much like the situation in *UMG Recordings, Inc. v. Mattel,*

---

[24] Respondent voluntarily disclaimed BRANDS when it filed the applications that matured into the '192 and '885 Registrations.

*Inc.*, 100 USPQ2d 1868, 1885 (TTAB 2011), in which the Board found that the stylized letter "M" above the word MOTOWN in one of the opposer's marks (shown below)



"merely reinforce[d] the first letter in MOTOWN."

We turn now to the required comparison of the marks in their entireties, giving greater weight in that comparison to the words ROYAL MIRAGE in Petitioner's mark, and the word MIRAGE in Respondent's marks, than to the other elements of the marks.[25]

### b. Similarity or Dissimilarity in Appearance

Respondent's MIRAGE BRANDS word mark is a standard character mark, which "may be presented in any font style, size or color, including the same font, size and color as the literal portions of [Petitioner's] mark," *Aquitaine Wine USA*, 126 USPQ2d at 1186, and in "the same stylization actually used or intended to be used by [Petitioner], or one that minimizes the differences or emphasizes the similarities between the marks." *Anheuser-Busch, Inc. v. Innvopak Sys. Pty Ltd.*, 115 USPQ2d

---

[25] As noted above, the parties stipulated to Petitioner's admissions of certain of Respondent's Requests for Admission, including Request Nos. 2, 4-6, and 11-12, which are directed to the first *DuPont* factor. 62 TTABVUE 2-9. Petitioner admitted that "Respondent's Mark is not identical to the Asserted Mark" (Req. No. 2), that there are differences in appearance and sound between the marks (Req. Nos. 4-6), and that the word "Royal" is not present in Respondent's marks and the word "Brands" is not present in Petitioner's mark (Req. Nos. 11-2). We find that these admissions of the obvious do not establish the dissimilarity of the marks in their entireties.

1816, 1823 (TTAB 2015) (citing *Citigroup Inc. v. Capital City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1258-59 (Fed. Cir. 2011)). We thus must assume that the MIRAGE BRANDS word mark could be displayed in the same stylization in which the words ROYAL MIRAGE appear in Petitioner's mark, *id.*, as shown below:

RoyAL MiRAGE

In such a depiction, Petitioner's mark, which is dominated by the words ROYAL MIRAGE and Respondent's word mark, which is dominated by the word MIRAGE, resemble each other visually. While there are visual differences between Petitioner's mark and Respondent's word mark, we find that the marks are more similar than dissimilar in appearance when considered in their entireties.

Respondent's composite mark displays the word MIRAGE above the word BRANDS in much larger letters, and beneath a design element that serves, in the context of the composite mark, to reinforce the leading letter "M" in MIRAGE. Petitioner's mark similarly displays the dominant words ROYAL MIRAGE beneath a design element that serves to reinforce the laudatory connotation of ROYAL. The parties' composite marks thus resemble one another visually. There are again differences between Petitioner's mark and Respondent's composite mark, but we find that the marks are more similar than dissimilar in appearance when considered in their entireties.

### c. Similarity or Dissimilarity in Sound

The parties are largely silent about the marks' similarity in sound. As noted above, their composite marks are all dominated by words, in part because their respective design elements are likely to be "viewed, not spoken," *In re Electrolyte Labs., Inc.*, 913 F.2d 930, 16 USPQ2d 1239, 1240 (Fed. Cir. 1990), and because the letter M in Respondent's mark merely reinforces the first letter in the word MIRAGE. It is the words in the composite marks that will be used "by [consumers] to request the goods," *Aquitaine Wine USA*, 126 USPQ2d at 1184, and the words ROYAL MIRAGE and MIRAGE BRANDS are more similar than dissimilar in sound because of the common presence of the word MIRAGE. The same is true in an aural comparison of Petitioner's mark and Respondent's word mark.

The similarity in sound will be greater if consumers engage in "the penchant of consumers to shorten marks," *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1961 (TTAB 2016), and drop the non-source-identifying word BRANDS when verbalizing Respondent's composite and word marks. *See id.* (penchant to shorten marks "would lead many consumers to drop the highly descriptive/generic term 'Blonde' when calling for" applicant's TIME TRAVELLER BLOND beer).

### d. Similarity or Dissimilarity in Meaning

With respect to connotation and commercial impression, Respondent argues, without supporting evidence, that the "commercial impression and connotation of Registrant's Mirage Brands Design Mark and Petitioner's Royal Mirage Design Mark are vastly different when viewed from a reasonable consumer's perspective." 65 TTABVUE 20. Respondent claims that "the 'ROYAL' component of Petitioner's Royal

Mirage Design Mark will be given primary attention by consumers, especially since it synchronizes with the crown graphic of the design mark and the additional crown element on the top of Petitioner's fragrance product packaging." *Id.*[26] "Thus viewed, the mere presen[ce] of a secondary word, Mirage, in Petitioner's Royal Mirage Design Mark is not likely to cause confusion with the commercial impression of [Respondent's] Mirage Brands Design Mark." *Id.* at 20-21. Respondent makes essentially the same argument with respect to the dissimilarity in meaning of Petitioner's mark to Respondent's word mark. *Id.* at 22.

We disagree with Respondent that the marks have "vastly different" connotations and commercial impressions. *Id.* at 20. Both of Respondent's marks are dominated by the word MIRAGE. The structure of the verbal portion of Petitioner's mark ("ROYAL MIRAGE") counsels against a reflexive application of the principle cited by Respondent that "consumers are generally more inclined to focus on the first word, prefix o[r] syllable in any trademark or service mark." *Id.* In Petitioner's mark, the adjective ROYAL, which means, inter alia, "suitable for royalty," 54 TTABVUE 6 (MERRIAM-WEBSTER DICTIONARY), modifies and is subordinate to the noun MIRAGE, and "royal" has been held repeatedly to be "'a suggestive word frequently used to indicate high quality.'" *Royal Petroleum Corp. v. River States Oil Co.*, 136 USPQ 79, 81 (TTAB 1962) (quoting *Sears, Roebuck & Co. v. Hofman*, 119 USPQ 137, 138 (CCPA 1958)); *see also Lane Ltd. v. Martin Brinkmann AG*, 145 USPQ 158, 160 (TTAB 1965)

---

[26] As noted above, we cannot consider the use of Petitioner's crown design on its packaging because such use in not reflected in the drawing of the mark in the '642 Registration.

("the word 'royal' is a highly suggestive term which has been frequently used to indicate high quality . . . ."); *cf. Standard Brands Inc. v. Peters*, 191 USPQ 168, 172 (TTAB 1975) ("The term 'ROYAL', because of its obvious laudatory suggestive connotation, has been considered by various tribunals to be a 'weak' mark entitled to a narrow orbit of protection in determining the question of the likelihood of confusion.") (collecting cases)).

Under these circumstances, and in the absence of any evidence to the contrary, we find that it is appropriate to give relatively less weight to the adjective ROYAL than to the noun MIRAGE in determining the connotation and commercial impression of Petitioner's mark. *Cf. Stone Lion*, 110 USPQ2d at 1161 (holding that the Board did not err in "according little weight to the adjective 'STONE' in applicant's STONE LION CAPITAL mark" in the course of "finding that 'STONE LION CAPITAL' is 'similar in sight, sound, meaning and overall commercial impression' to 'LION CAPITAL' and 'LION.'"). The word MIRAGE in both parties' marks would likely be understood by consumers to mean "something illusory and unattainable like a mirage," 39 TTABVUE 6 (MERRIAM-WEBSTER DICTIONARY), giving the parties' marks a similar overall meaning.[27]

Ms. Hamerling characterized MIRAGE BRANDS "as a 'house brand' or house mark," Hamerling Decl. ¶ 18 (57 TTABVUE 7), and if a consumer is exposed to

---

[27] The literal meaning of "mirage" is "an optical effect that is sometimes seen at sea, in the desert, or over a hot pavement, that may have the appearance of a pool of water or a mirror in which distant objects are seen inverted, and that is caused by the bending or reflection of rays of light by a layer of heated air of varying density." 39 TTABVUE 6 (MERRIAM-WEBSTER DICTIONARY). In the context of perfumes, the more abstract and mysterious meaning discussed above seems far more likely to be the one understood by consumers.

Respondent's "house brand" and separately encounters Petitioner's mark, the consumer could readily view Petitioner's mark as identifying a particular perfume figuratively "suitable for royalty" that emanates from Respondent's MIRAGE BRANDS "house." *Cf. Joel Gott Wines, LLC v. Rehoboth Von Gott, Inc.*, 107 USPQ2d 1424, 1433 (TTAB 2013) ("Purchasers of opposer's GOTT and JOEL GOTT wines are likely to assume that applicant's goods, sold under the mark GOTT LIGHT and design, are merely a line extension of goods emanating from opposer."). We find that the parties' marks are more similar than dissimilar in connotation and commercial impression when considered in their entireties.

### e. Conclusion Regarding Similarity or Dissimilarity of the Marks

There are differences between the parties' marks in appearance, sound, meaning and commercial impression, but they are outweighed by the marks' similarities, particularly taking into account that the identity of the goods with which the marks are used "reduces the degree of similarity between the marks necessary to find a likelihood of confusion." *New Era*, 2020 USPQ2d 10596, at *14; *accord Coach Servs.*, 101 USPQ2d at 1721; *Mighty Leaf Tea*, 94 USPQ2d at 1260. The first *DuPont* factor also supports a finding of a likelihood of confusion as to both of Respondent's registrations.

### 4. Purchase Conditions and Consumer Sophistication

As noted above, the fourth *DuPont* factor examines both "the conditions under which and buyers to whom sales are made, i.e., 'impulse vs. careful sophisticated purchasing.'" *DuPont*, 177 at 567. "Purchaser sophistication may tend to minimize

the likelihood of confusion. Conversely, impulse purchases of inexpensive items may tend to have the opposite effect." *Palm Bay Imps.*, 73 USPQ2d at 1695 (citing *Recot, Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000)). "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot*, 54 USPQ2d at 1899.

Petitioner testified that the "pricing spectrum in the fragrance industry is wide." Sabhnani Decl. ¶ 41 (40 TTABVUE 15). According to Petitioner, both his and Respondent's perfumes "fall into the *most* accessible end of the fragrance (and cosmetics) spectrum" because "[a]t $5.00 per fluid ounce of fragrance ($19.99 for a four-ounce bottle)," his perfumes provide "a quality, economic option for those in the market for fragrances" and because Respondent's "products sell on the Amazon Marketplace at the same price point: $3.00-$7.00 per ounce." 64 TTABVUE 26 (emphasis supplied by Petitioner) (citing Sabhnani Decl. ¶ 32; Ex. 7 (40 TTABVUE 12, 99-108)). He argues that "[t]his low price point is relevant because consumers may not take the time to learn that the two brands are distinct, share no common owner, and are completely unrelated." 64 TTABVUE 26. *Id.* Petitioner also testified that at the price point for his perfumes, "Royal Mirage fragrances and personal care items *can* be purchased spontaneously with a view towards experimentation and discovery of a new fragrance," and that "[a] consumer paying $15.00 - $20.00 for a bottle is naturally less likely to engage in the same level of research and scrutiny into brand

distinction and source as one paying $450 for a bottle." Sabhnani Decl. ¶¶ 43-44 (40 TTABVUE 16-17) (emphasis supplied by Petitioner).

Respondent acknowledges that it "sells its fragrance products to distributers [sic], chain retailers and large volume distributors in the United States at a very low price point," 65 TTABVUE 23 (citing Hamerling Decl. ¶¶ 27, 60 (57 TTABVUE 9, 16)), that it "offers affordable and budget fragrance products that are sold by various economical, affordable and low-end brick and mortar retailers," *id.* (citing Hamerling Decl. ¶¶ 61-62 (57 TTABVUE 17)), and that its "fragrance products are sold by its retailers to end-user retail customer for $5.00 or less for a 3.4 fluid ounce bottle (just $1.46 per fluid ounce)." *Id.* at 24 (emphasis supplied by Respondent) (citing Hamerling Decl. ¶¶ 30, 64 (57 TTABVUE 9, 17)).[28] Respondent nevertheless argues that consumers will exercise care in purchasing its fragrances because "purchasing a perfume or cologne is directly linked to a consumer's preference as to scent," it sells more than 240 "fragrances each having its own unique scent," and "[a]s a result, consumers typically give careful consideration to the scents of the perfume and/or cologne they prefer, together with the individual product name to help them identify which products contain which scent." *Id.* at 29 (citing Hamerling Decl. ¶ 59 (57 TTABVUE 16)).

Our analysis under the fourth *DuPont* factor "must be based on the identification[s] of goods in the pleaded ['642] Registration and [Respondent's '192

---

[28] At her deposition, Ms. Hamerling confirmed that Respondent's fragrances are sold at retail for $5.00 or below. Hamerling Tr. 50:13-51:4, 8-52:1 (41 TTABVUE 48-50).

and '885 Registrations], as that determines the scope of the benefit of registration." *Sock It to Me, Inc. v. Fan*, 2020 USPQ2d 10611, at \*7 (TTAB 2020) (citing *Stone Lion*, 110 USPQ2d at 1162). The parties' goods identifications cover "perfume(s)" and "include[ ] all goods of the type identified, without limitation as to their nature or price." *Id.*, at \*9. Because the parties' registrations do not limit the goods identified as "perfume(s)" to "a particular price point, we must treat the goods as including inexpensive as well as high-end perfumes, and therefore presume that purchasers for these goods include ordinary consumers who may buy inexpensive perfume on impulse." *In re i.am.symbolic, llc*, 116 USPQ2d 1406, 1413 (TTAB 2015), *aff'd*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017). The record confirms that perfumes may indeed be sold at very low price points, and may be purchased through the Internet under circumstances in which it is impossible for consumers to give "careful consideration to the scents of the perfume," 65 TTABVUE 29, prior to purchase.

Because the goods at issue may be "relatively low-priced and subject to impulse buying, we find that the fourth *DuPont* factor weighs in favor of finding a likelihood of confusion." *Sock It to Me*, 2020 USPQ2d 10611, at \*8.

### 5. The Seventh and Eighth *DuPont* Factors

We turn next to the *DuPont* factors regarding evidence of actual confusion or the absence of such evidence.

### a.   The Nature and Extent of Any Actual Confusion

"Evidence of actual confusion, where it exists, would of course be highly probative of a likelihood of confusion." *Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 2020 USPQ2d 10914, at \*19 (TTAB 2020), *aff'd in relevant part, vacated in part*, 17

F.4th 129, 2021 USPQ2d 1069 (Fed. Cir. 2021) (citing *Edom Labs.*, 102 USPQ2d at 1553) ("The existence of actual confusion is normally very persuasive evidence of likelihood of confusion and undercuts any possible claim that the marks are so dissimilar that there can be no likelihood of confusion.")). "Properly introducing instances of actual confusion into the record and persuading the trier of fact as to the probative value of such evidence is [Petitioner's] burden." *Id.*

Petitioner argues that there is "evidence which suggests that actual confusion has occurred," in the form of his testimony "that in the time precipitating his commencement of this action, he received numerous phone calls to his office inquiring about the origins of MIRAGE BRANDS and if it was related to ROYAL MIRAGE."[29] 64 TTABVUE 30 (citing Sabhnani Decl. Second Numbered ¶ 45 (40 TTABVUE 19)).

Respondent argues that the "evidentiary record before the Board is clear: no actual confusion has occurred between products bearing the ROYAL MIRAGE Design Mark and the MIRAGE BRANDS Marks." 65 TTABVUE 29. Respondent cites Ms. Hamerling's testimony that she is unaware of any actual confusion, *id.* (citing Hamerling Decl. ¶¶ 68-74 (57 TTABVUE 17-18)), and argues that Petitioner has not submitted any evidence of actual confusion. *Id.* at 30. Respondent concludes that "in the absence of any actual confusion in the marketplace, this *du Pont* factor weighs in favor of" Respondent. *Id.*

---

[29] Petitioner admitted at his deposition that his evidence of actual confusion consists solely of these calls. Sabhnani Tr. 125:3-21 (55 TTABVUE 105).

Petitioner's main brief characterizes the calls that he received as "inquiring about the origins of MIRAGE BRANDS and if it was related to ROYAL MIRAGE." 64 TTABVUE 30. Petitioner testified at trial that the calls were "from prospective customers asking if 'Mirage Brands' fragrance products were manufactured by [his company] RMP Ltd. or associated with me. On average, I have received approximately six to ten such calls per year." Sabhnani Decl. Second Numbered ¶ 45 (40 TTABVUE 19). Petitioner testified at his deposition that in response to these inquiries, he confirmed "that we are two separate companies." Sabhnani Tr. 118:23-25 (55 TTABVUE 104).

To the extent that the calls received by Petitioner asked whether Mirage Brands was "associated with me," Sabhnani Decl. Second Numbered ¶ 45 (40 TTABVUE 19), they may be viewed as "inquiries as to whether the companies are related," which "do not demonstrate confusion [but] rather . . . that the individuals underst[ood] that the companies may be different entities." *Brooklyn Brewery*, 2020 USPQ2d 10914, at *25 (citing *Mini-Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1475 (TTAB 2016); *Couch/Braunsdorf*, 110 USPQ2d at 1479 (email to petitioner from one of its prospective customers referencing another email from a third party and asking "Is this the same company?" found not to be evidence of actual confusion because "it indicates the prospective customer suspected that there were two different companies"); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1334 (TTAB 1983) (inquiries as to corporate affiliations are not evidence of actual confusion because, without more, they "indicate that these persons were aware that [the companies at issue] were two different entities"); *Elec. Water Conditioners, Inc. v.*

*Turbomag Corp.*, 221 USPQ 162, 164 (TTAB 1984) ("That questions have been raised as to the relationship between firms is not evidence of actual confusion of their trademarks.")). *See also Chutter*, 2021 USPQ2d 1001, at *45-46 (half-dozen inquires over 14 years to the effect that "I know there's a restaurant by this name out in California, do you have anything to do with it" found to "have little probative value because they are ambiguous and do not clearly provide evidence of consumers who are confused about the source of the services"). *But see Sw. Mgmt., Inc. v. Ocinomled, Ltd.* 115 USPQ2d 1007, 1030 & n.148 (TTAB 2015), *aff'd per curiam*, 652 F. App'x 971 (Fed. Cir. 2016) ("Instances of people inquiring of affiliation between the parties [are], at best, much less probative" than other forms of actual confusion in the record, but were given some weight in the context of other more credible evidence of actual confusion); *Harry Winston, Inc. v. Bruce Winston Gem Corp.*, 111 USPQ2d 1419, 1443 (TTAB 2014) (inquires as to affiliation "are sometimes interpreted as an indication that the inquirer is alert to the differences between the marks and skeptical of any relationship between them," but were rejected because "we find the testimony relating to these incidents to be too lacking in detail to demonstrate actual confusion."). To the extent that the calls received by Petitioner asked him "if 'Mirage Brands' fragrance products were manufactured by [his company] RMP Ltd.,'" Sabhnani Decl. Second Numbered ¶ 45 (40 TTABVUE 19), they may more readily be viewed as instances of actual confusion about the manufacturing source of the goods.

All of Petitioner's testimony regarding actual confusion is vague in every respect, however, even to the point of suggesting that he recalled receiving the first call before

Respondent began use of its mark. As noted above, Ms. Hamerling testified that Respondent "began using the MIRAGE BRANDS Marks in the United States on or around December 21, 2016." Hamerling Decl. ¶ 4 (57 TTABVUE 4). Petitioner testified at trial that the first call was "in or around 2016," Sabhnani Decl. Second Numbered ¶ 45 (40 TTABVUE 19), and in his deposition, taken on July 28, 2020, he placed the first call as "[a]bout three to five years back" or sometime between July 2015 and July 2017. Sabhnani Tr. 117:24-118:2 (55 TTABVUE 103-04).

Given Mr. Sabhnani's inability to identify any caller or to specifically date any call after receiving what he testified were as many as 30 or more such calls, we find his "testimony relating to these incidents to be too lacking in detail to demonstrate actual confusion," *Harry Winston*, 111 USPQ2d at 1443, even as to any calls that may be considered to be more than mere inquiries as to affiliation. *See also Brooklyn Brewery*, 2020 USPQ2d 10914, at *25 ("Courts and leading trademark treatises consistently note that relatively imprecise averments of employees of parties in whose interest it is to prove confusion that the employees have dealt with confused consumers is, without further corroboration, generally not entitled to much weight.") (citations omitted). But "evidence of actual confusion is not required in order to establish likelihood of confusion," *Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1642 n.23 (TTAB 2007), and the seventh *DuPont* factor is thus neutral in our analysis of the likelihood of confusion.

### b. The Absence of Evidence of Actual Confusion

We have found that Petitioner did not introduce credible evidence of actual confusion, and we credit Ms. Hamerling's testimony that Respondent is aware of

none. Respondent argues under the eighth *DuPont* factor that the parties' marks "have been used concurrently for over four (4) years and, during that time period, there has been no evidence of actual confusion between those trademarks," and that "[b]ecause these marks are able to coexist without confusion in the marketplace, this factor weighs heavily in favor of [Respondent]." 65 TTABVUE 31. Petitioner argues that "given the short period of time during which the goods have been in direct competition (only a couple of years, since the Respondent['s] marks had only been registered for approximately 1 year at the start of this proceeding), the probative value of evidence of [no] actual confusion is minimal." 64 TTABVUE 30-31.

"The absence of any reported instances of confusion is meaningful only if the record indicates appreciable and continuous use by [Respondent] of its mark[s] for a significant period of time in the same markets as those served by [Petitioner] under [his] mark[ ]." *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011) (quoting *Gillette Can. Inc. v. Ranir Corp.*, 1768, 1774 (TTAB 1992)). "In other words, for the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred." *Id.*

"As noted above, our analysis of the second, third, and fourth *du Pont* factors, discussing the similarity or dissimilarity of the [goods], channels of trade, and relevant consumers, is based, as dictated by precedent from the Federal Circuit, on the identifications **as set forth** in the [parties' registrations]." *In re Guild Mortg. Co.*, 2020 USPQ2d 10279, at *6 (TTAB 2020) (emphasis in original). "The eighth *du Pont*

factor, by contrast . . . requires us to look at **actual market conditions**, to the extent there is evidence of such conditions in the record." *Id.* (emphasis in original). Accordingly, we must look to the parties' actual activities in the marketplace to determine whether there has "been a reasonable opportunity for confusion to have occurred." *Citigroup*, 94 USPQ2d at 1660.

When trial began in November 2020, the parties' marks had been used concurrently for slightly fewer than four years. But Respondent argues (for other purposes) that Petitioner's "fragrance products are not available for sale in any of the retail stores where Mirage Brands products are available for sale," 65 TTABVUE 23 (citing Hamerling Decl. ¶ 63 (57 TTABVUE 17)), that "[n]either Mirage Brands, nor its retailers or distributors, sell Mirage Brand fragrance products on www.Amazon.com," *id.* at 24 (citing Hamerling Decl. ¶¶ 65-66 (57 TTABVUE 17)), and that "any listings on www.Amazon.com are put there by unknown third parties who are unrelated to Mirage Brands." *Id.* As discussed above, Respondent also points to "Royal Mirage and its *de minimis* sale and distribution of its fragrance products in the United States," *id.* at 25, and argues that Petitioner's products are sold primarily on Amazon.com, that Petitioner does not sell directly to retail stores, and that Petitioner's "gross sales in the United States of Royal Mirage products in 2019 was [sic] just **$6,246**." *Id.* (emphasis supplied by Respondent) (citing Sabhnani Decl. ¶ 30 (40 TTABVUE 11), Sabhnani Tr. 84:3-10; 109:23-25; Ex. 8 (55 TTABVUE 84, 100, 170)). Petitioner testified at his deposition that his gross sales in 2017 and 2018 were

$3,756 and $6,535, respectively. Sabhnani Tr. 82:22-83:20; 88:14-25; Ex. 8 (55 TTABVUE 82-83, 88, 170).

Given the different channels of trade actually used by the parties, and the very low level of Petitioner's sales, there has not "been a reasonable opportunity for confusion to have occurred" during the four or so years of concurrent use of the parties' marks. *Citigroup*, 94 USPQ2d at 1660. We find that the eighth *DuPont* factor is neutral in our analysis of the likelihood of confusion.

### 6. Conclusion Regarding the *DuPont* Factors

The first, second, third, and fourth *DuPont* factors support a finding of a likelihood of confusion because the goods, channels of trade, and classes of consumers are identical in part, the marks are more similar than dissimilar, and perfumes may be subject to impulse purchase, while the sixth, seventh, and eighth *DuPont* factors are neutral. In view of these findings, we conclude that Petitioner proved by a preponderance of the evidence that Respondent's use of its composite mark and word mark is likely to cause confusion. Moreover, the record shows that Respondent's presence in the marketplace is considerably greater than that of Petitioner, presenting a circumstance of reverse confusion in which consumers exposed to Respondent's marks for perfumes who encounter Petitioner's mark for perfume are likely to believe mistakenly that Petitioner's goods originate with Respondent. Because Petitioner also established his priority by a preponderance of the evidence, Petitioner proved his claim under Section 2(d).

**Decision**: The Petition for Cancellation is granted as to both registrations on the basis of Petitioner's claim of priority and likelihood of confusion under Section 2(d) of

the Trademark Act, and Registration Nos. 5394192 and 5367885 will be cancelled in due course.